FILED

JAN 07 2020

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                    Deputy Clerk

Thomas Joseph Lynch
13681 Newport Ave., Suite 8348
Tustin, CA 92780
Telephone: (714) 321-6971
Facsimile: (949) 423-1419
Email: thomaslynch1957@gmail.com

Plaintiff, Representing self

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:19-bk-14600-TA |
| CONSUMER FINANCIAL ALLIANCE LLC, a California limited liability company, | Chapter 7 |
| Debtor. | **PLAINTIFF THOMAS J. LYNCH'S NOTICE OF MOTION AND MOTION TO DISMISS CHAPTER 7 BANKRUPTCY PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE, RULE 12 (b)(6); and DECLARATION OF PLAINTIFF THOMAS J. LYNCH** |
| THOMAS J. LYNCH, | |
| Plaintiff, | The Honorable **THEODOR C. ALBERT** |
| versus | |
| CONSUMER FINANCIAL ALLIANCE LLC, a California limited liability company, TANG AND ASSOCIATES a California Professional Law Corporation, and KEVIN TANG, a California resident, | Date:        January 28, 2020<br>Time:        11:00 a.m.<br>Courtroom:  5B<br>Place:        411 West Fourth Street<br>                Santa Ana, CA 92701 |
| Defendants. | |

TO: ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 28, 2020 at 11:00 a.m. in Courtroom 5B of the above-titled Court located at 411 W Fourth St, Santa Ana, CA, Plaintiff THOMAS J. LYNCH

1 | (LYNCH) will move this Court for an Order dismissing Defendant CONSUMER FINANCIAL

2 | ALLIANCE LLC's (CFA), chapter 7 bankruptcy petition filed on November 23, 2019 by Defendant

3 | KEVIN TANG (TANG).

4 | This Motion will be made on the grounds TANG has no standing, nor authority to file for

5 | bankruptcy on behalf of Consumer Financial Alliance LLC.  The motion is brought under Federal

6 | Rules of Civil Procedure (FRCivP), Rule 12(b)(1-2, 4-5).

7 | Defendant is advised that Local Bankruptcy Rule 9013-1(f) requires a written response to be

8 | filed and served at least 14 days before the hearing.

9 | This Motion shall be based upon this Notice, the attached Memorandum of Points and

10 | Authorities, Declaration of Thomas J. Lynch, the complete files and records of this action, and such

11 | other evidence as may be presented at the hearing on this Motion.

12 | Dated: December 31, 2019

13 | Respectfully submitted,

Thomas Joseph Lynch
13681 Newport Ave., Suite 8348
Tustin, CA 92780
Telephone: (714) 321-6971
Facsimile: (949) 423-1419
Email: thomaslynch1957@gmail.com
Plaintiff, Representing self

///
///
///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PRELIMINARY STATEMENT**

Plaintiff LYNCH brings this motion to dismiss the bankruptcy petition brought by Debtor TANG on the grounds TANG has no standing, nor authority, to file for bankruptcy on behalf of Consumer Financial Alliance, LLC. (CFA), as TANG is only a fifty-fifty Partner and has no authority pursuant to a partnership agreement (**EXHIBIT A**) entered into by LYNCH and TANG. Plaintiff LYNCH contends the bankruptcy matter must be dismissed, accordingly.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**FACTUAL HISTORY**

After being introduced to Plaintiff LYNCH as a successful business man and thereafter knowing Plaintiff LYNCH for several months and repeatedly commenting on the quality of LYNCH's work in the debt relief services industry, Debtor TANG approached LYNCH with a plan. TANG would invest with LYNCH as fifty-fifty Partners, i.e., they would go into business together. A Partnership Agreement (Agreement; **EXHIBIT A**) was drafted and signed on March 8, 2019. LYNCH agreed to the Partnership and began teaching TANG everything he knew about the industry complexities. One being, the change in the name of the business from Veritas Financial Solutions LLC, a California Limited Liability Company (Veritas) to Consumer Financial Alliance LLC, a California Limited Liability Company (CFA) because LYNCH advised TANG there was another business named Veritas in the industry who LYNCH had known the owners for over ten (10) years, so LYNCH came up with the name of CFA and LYNCH got CFA up and running. (Declaration of Thomas J. Lynch ("LYNCH Decl.") ¶ 6).

In its pertinent parts, the Agreement makes references to what the Partners—plural—may or may not do. It simply does not allow one of the Partners to act *unilaterally* in such a manner as to request bankruptcy protection. This is especially true when the company does not need such protection. (LYNCH Decl. ¶¶ 2 & 3). LYNCH had put everything in place and made adjustments so that CFA would have been cash positive in December 2019 (LYNCH Decl. ¶13). A look at the Agreement repeatedly demonstrates all Partners must act together:

➤ ¶. 3. The Partnership shall continue until terminated pursuant to Section 18 of This Agreement.

1   ➤ ¶. 7.   Ownership Interest. The Partner's ownership interest to The Partnership shall be as

2   follows:  Lynch 50%  Tang 50%

3   ➤ ¶. 11. The Partnership will continue until the Partners mutually agree to terminate it.

4   ➤ ¶. 15.   Management. The management, control and conduct of CFA shall be conducted by

5   both Tang and Lynch. Both Tang and Lynch shall have equal voting rights and authority of CFA.

6   ➤ ¶. 18.  Causes For Termination. The Partnership shall be terminated upon the earlier of:

7   18.1 The incompetency, insolvency, or death of all of the Partners;

8   18.2 The decree of any court of competent jurisdiction directing the dissolution or termination

9   of The Partnership; or

10   18.3 Execution of a written declaration of intention to terminate The Partnership by all of the

11   Partners.

12   The incompetency, insolvency or death of any one or more of the Partners (but not all

13   Partners) shall not terminate The Partnership.

14   ➤ ¶. 19.   Assignability of Interests. The interest of a Partner may be assigned or transferred in

15   whole or in part from one Partner to any other Partner within The Partnership with the written consent

16   of both Tang and Lynch. Except as provided in the preceding sentence, the interest of a Partner may

17   not otherwise be assigned, pledged, hypothecated or transferred under any other circumstances all

18   except by reason of death or incapacity to that Partner's executor or administrator.

19   ➤ ¶. 20.   Withdrawal by Partners.  (a) A Partner may, by notice to each of the other Partners at

20   least seventy-five (75) days prior to the last day of any physical year elect to withdrawal from The

21   Partnership. …as both Tang and Lynch may determine; (b) With approval of both Tang and Lynch, a

22   Partner may, by notice to each of the other Partners at least seventy-five (75) days prior to the last day

23   of any physical year.

24   ➤ ¶. 22.  Amendments. This Agreement may be amended only by the written consent of all of

25   the Partners.

26   ➤ ¶. 25.  Entire Agreement. This Agreement constitutes the entire Agreement between Partners,

27   Lynch and Tang as related to the specific subject matter herein. There are no additional terms,

28   obligations, covenants, representations, statements, or conditions, other than those contained herein.

1 No variations or modifications of this Agreement or waivers of the terms or provisions herein shall be

2 deemed valid unless expressly stated in writing and signed by both Partners.

3   It is beyond argument that TANG has no authority to act outside the parameters of the

4 partnership Agreement, without legally dissolving the partnership. The filing for bankruptcy

5 *unilaterally* clearly violates the Agreement and should not be permitted.

6   After only a period of eleven (11) months, LYNCH went to the partnership office of CFA

7 located at 18377 Beach Blvd., Suite 211, Huntington Beach, CA 92648, only to find out he had been

8 locked out. LYNCH and another employee physically attempted to enter, only to be physically forced

9 *out by TANG.* (LYNCH Decl. ¶16). On this same day, TANG informed LYNCH that he was

10 terminating the partnership, without the required notice, and filing for bankruptcy. (LYNCH Decl.

11 ¶18). LYNCH attempted to make it clear to TANG at that time that TANG had no such authority, but

12 TANG literally threatened LYNCH, locked him out and commenced these unnecessary proceedings.

13 (LYNCH Decl. ¶19).

14   This is following a flurry of communications between LYNCH and TANG regarding the

15 future of CFA. As previously stated, LYNCH brought a viable business model to TANG. The offer by

16 LYNCH was to start a debt relief services company with TANG. LYNCH's proposal to start a

17 minimum Five-Million Dollar net profit/year company would require approximately One Hundred-

18 Fifty Thousand Dollars to become cash positive, which is unheard of in the industry. Only because of

19 LYNCH's cutting-edge model was LYNCH able to achieve such results. (LYNCH Decl. ¶ 5).

20   On October 13, 2019, LYNCH sent an email to TANG requesting payments to 8 notaries' who

21 provided services to CFA (LYNCH Decl. ¶ 10). TANG stated to Lynch and another employee that

22 after December 31, 2019, he was not going to put any more money into the partnership and we have

23 until then to get cash positive. (LYNCH Decl. ¶ 11). On October 31, 2019, LYNCH sent a follow up

24 3rd email to TANG inquiring as to whether he had paid the previous 8 notaries, as LYNCH was

25 receiving calls and emails from several notary's who had not receive their checks. In that same email,

26 LYNCH requested payment for an additional 5 notaries' who provided services to CFA (LYNCH

27 Decl. ¶ 12). On November 17, LYNCH emailed TANG 15 invoices from CFA's lead provider for

28 leads provided to CFA in the preceding month of October 2019 (LYNCH Decl. ¶ 13).

1    The same day, TANG sent LYNCH a text stating, "tell Bruce we are laying him off. CFA will

2    be closed December 15th. You can transfer the clients to you own company" (LYNCH Decl. ¶ 22). On

3    November 19, 2019, LYNCH tried to access CFA's bank account online, but his access was denied

4    and that TANG had lied to Chase Bank about being sole owner of CFA and had LYNCH removed

5    from CFA's company bank account (LYNCH Decl. ¶ 15). On November 19, 2019, LYNCH and

6    another employee tried to enter CFA's office only to be physically forced out by TANG (LYNCH

7    Decl. ¶ 16). After the door was slammed in LYNCH's face, LYNCH tried his key to CFA's office and

8    discovered the key had been changed on the front door lock of CFA (LYNCH Decl. ¶ 17). The same

9    day, TANG informed LYNCH he was terminating the partnership and filing for bankruptcy as CFA

10    was insolvent. (LYNCH Decl. ¶ 18). LYNCH made it clear to TANG he had no such authority to file

11    bankruptcy on behalf of CFA and CFA was not insolvent. (LYNCH Decl. ¶ 19). On November 21,

12    2019, LYNCH provided the Secretary of State documents to Chase Bank along with the Partnership

13    Agreement demonstrating LYNCH's 50% ownership and manager status of CFA and Chase

14    immediately reinstated LYNCH on CFA's company bank account. (LYNCH Decl. ¶ 20).

15    On November 21, 2019, LYNCH sent an email to TANG with adjusted expenses demonstrating

16    CFA would be cash positive in December 2019 (LYNCH Decl. ¶ 21). LYNCH stated to TANG that

17    Pursuant to express language of the Partnership Agreement, TANG had a duty to "provide the initial

18    capital contributions for CFA operating expenses until CFA is cash positive" (LYNCH Decl. ¶ 22).

19    The same day, LYNCH texted TANG inquiring, "Kevin, please let's work this out. I will find

20    somebody to buy you out. How much would it cost to buy you out?" (LYNCH Decl. ¶ 23). TANG

21    responded to LYNCH's text via text saying, "If you have $50K upfront we can talk." (LYNCH Decl. ¶

22    24).

23    On November 22, 2019, TANG forwarded me an email from CFA's sales lead provider with an

24    outstanding invoice for $17,176.00 for leads provided to CFA in the month of October 2019 (LYNCH

25    Decl. ¶ 25). Later that day, LYNCH called TANG and informed him LYNCH was working on refunds

26    with lead provider (LYNCH Decl. ¶ 26). The same day, TANG sent LYNCH an email claiming that

27    TANG was working something out with the lead provider first and for LYNCH not to speak with him.

28    (LYNCH Decl. ¶ 27). The same day, TANG sent LYNCH an email claiming TANG had made an

1  offer to the lead provider of two-Thousand Dollars ($2,000) to resolve the $17,176.00 past due

2  invoices. Included in that email, TANG stated "All the money coming in will be used to pay current

3  bills first and you get the clients". (LYNCH Decl. ¶ 28).  The same day, LYNCH responded to TANG,

4  "Once we sign a waiver and release then you will NOT be responsible for any liabilities of CFA. I

5  want to keep CFA intact with the clients still under the CFA name and everything the same…and you

6  can withdraw as a partner. DO NOT dissolve CFA." (LYNCH Decl. ¶ 29).

7        On November 25, I sent TANG an email stating "I had been working all weekend on the

8  refunds" and attached are the reports demonstrating $11,454.00 of refunds on the $17,176.00 past due

9  invoices with a net balance now owed of only $5,722. (LYNCH Decl. ¶ 30).  The same day, TANG

10  responded to LYNCH's email, "I don't care about this. CFA has to be dissolved." In the same email

11  TANG stated, "I cannot allow you to take the company…and run the business while incurring

12  additional debts and exposing me to future liabilities from vendors and from clients if you take the fees

13  without doing the work"…"I have retained an attorney regarding this matter…I will not communicate

14  with you". (LYNCH Decl. ¶ 31). The same day, LYNCH responded to TANG's email, "I had tried

15  calling your attorney and her voice mail says she will be out of the office until December 6th (eleven

16  more days). Pursuant to paragraph 20 of the Partnership Agreement you can 'Withdraw' as a partner

17  and eliminate any future liabilities from vendors and from clients, regardless of how I handle the

18  company moving forward. Or, transfer clients to my other company to service them. I can also get a

19  letter from the lead provider if needed." (LYNCH Decl. ¶ 32).

20        Not hearing back from TANG, on December 2, 2019, LYNCH sent an email to TANG stating, "I

21  do not have your attorney's email and wanted to get this out to you asap, as time is of the essence.

22  Since you do not want to be partners with me anymore and are concerned about your liability from

23  Consumer Financial Alliance LLC, below is my proposal that will work for the both of us. As you

24  have proposed, "Pay off all outstanding bills and you can have the business" & "Bring the balance

25  current on all the bills and you can have the clients." We dissolve Consumer Financial Alliance LLC

26  (CFA). We then transfer the clients to a new company and I will service them and I will take 100% of

27  the past, present, and future liabilities from all Clients and vendors of CFA. I will sign a Promissory

28  Note under the new company to pay you back 100% of the money you have invested, which will be

7

1  guaranteed/secured by the existing CFA Client's future fees. You may file a UCC1 against the new

2  company for the money you are owed. As you said, you want to be paid back a minimum $2,500 per

3  month. So, the Promissory Note will state that you shall receive a minimum $2,500 per month and

4  25% from any new clients until you are paid back in full. This way, we both get what we want

5  amicably and the clients are taken care of and will receive the service we promised them." (LYNCH

6  Decl. ¶ 33). The same day TANG responded to my email stating, "Please do not contact me. You can

7  contact my attorney. The bankruptcy case has been filed. You have to contact the trustee regarding the

8  assets of the estate." (LYNCH Decl. ¶ 34). Also attached to TANG's email was a "Notice of

9  Bankruptcy Case Filing" with a filing date of November 23, 2019 stating a chapter 7 bankruptcy

10 petition was filed on behalf of CFA filed by CFA's attorney TANG (LYNCH Decl. ¶ 35). This was

11 the first time LYNCH had become aware of CFA filing a chapter 7 bankruptcy petition (LYNCH

12 Decl. ¶ 36). TANG had filed bankruptcy on CFA ten (10) days prior without LYNCH's knowledge or

13 consent (LYNCH Decl. ¶ 37).

14      Thereafter, LYNCH looked on PACER and found the Bankruptcy Petition for CFA, which

15 included a "Statement Regarding Authority to Sign and File Petition" where TANG states under

16 penalty of perjury, "a special meeting was duly called and held on November 23, 2019" and "it is in

17 the best interests of CFA to file chapter 7 bankruptcy" and TANG "is authorized and directed to

18 execute and deliver all documents necessary to perfect the filing of a chapter 7 voluntary bankruptcy"

19 and TANG "is authorized and directed to appear in all bankruptcy proceedings on behalf of CFA" and

20 TANG "is authorized and directed to employ TANG and the law firm of Tang & Associates to

21 represent CFA in such bankruptcy case" (LYNCH Decl. ¶ 38). LYNCH was never notified, nor did he

22 attend, "a special meeting" on November 23, 2019 (LYNCH Decl. ¶ 39). LYNCH declares it is NOT

23 in the best interest of CFA to file chapter 7 bankruptcy (LYNCH Decl. ¶ 40). LYNCH I never agreed

24 to TANG to be authorized and directed to execute and deliver all documents necessary to perfect the

25 filing of a chapter 7 voluntary bankruptcy. (LYNCH Decl. ¶ 41). LYNCH never agreed to TANG to

26 be authorized and directed to appear in all bankruptcy proceedings on behalf of CFA. (LYNCH Decl.

27 ¶ 42). LYNCH never agreed to employ TANG, or the law firm of Tang & Associates to represent CFA

28 in such bankruptcy case, as that would be a serious conflict of interest under these circumstances.

1  (LYNCH Decl. ¶ 43). LYNCH declares CFA is NOT insolvent (LYNCH Decl. ¶ 2).

2  **LEGAL STANDARD**

3      To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "the complaint must contain

4  sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

5  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The complaint must be dismissed if plaintiffs can prove

6  no set of facts in support of their claim which would entitle them to relief. *Kowai v. MCI Commc'ns*

7  *Corp.,* 16 F.3d 1271, 1266 (D.C. Cir. 1994).  When considering a Rule on a 12(b)(6) motion to

8  dismiss, the court must construe the complaint liberally in the plaintiffs' favor and grant plaintiffs the

9  benefit of all inferences that can be derived from the facts alleged. *Id.*  However, the court "need not

10  accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the

11  complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Id.*  In

12  resolving a motion to dismiss, a court "may consider…matters of which [the court] may take judicial

13  notice." *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  The court

14  may take judicial notice of the physical location and characteristics of the Supreme Court plaza. *See*

15  *Hodge v. Talkin,* 799 F.3d 1145, 1151 (D.C. Cir. 2015); Fed. R. Evid. 201.

16      Under Fed. R. Civ. P. 12(b)(1), a court must grant a motion to dismiss if it lacks subject-

17  matter jurisdiction to hear a claim. A motion to dismiss for want of standing is . . . properly brought

18  pursuant to Rule 12(b)(1), because standing is a jurisdictional matter.  Federal courts lack subject-

19  matter jurisdiction over claims asserted by litigants who lack standing.  *Hoffman v. Pulido*, 928 F.3d

20  1147, 1151 (9th Cir. 2019), *citing Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) ("A

21  suit brought by a plaintiff without Article III standing is not a case or controversy, and an Article III

22  federal court therefore lacks subject matter jurisdiction over the suit." (internal quotation marks

23  omitted)).

24  **ARGUMENT**

25  **I. THE COURT LACKS JURISDICTION OVER THIS ACTION**

26  **A. Debtor lacks U.S. Constitution, Article III standing.**

27      The standing inquiry requires careful judicial examination of a complaint's allegations to

28  ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.

1  *Allen v. Wright*, 468 U.S. at 737, 752 (1984). To demonstrate the requisite Article III standing,

2  Plaintiff must establish:

3      1. that they "have suffered an injury in fact — an invasion of a legally protected interest

4  which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical";

5      2. that the injury is "fairly [traceable] to the challenged action of the defendant,"

6  and not the result of "the independent action of some third party not before the court"; and

7      3. that it is "likely, as opposed to merely speculative, that the injury will be redressed by a

8  favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (*citations and*

9  *internal quotation marks omitted*). The purpose of these requirements is "to prevent the judicial

10  process from being used to usurp the powers of the political branches." *Clapper v. Amnesty*

11  *International USA*, 568 U.S. 398, 408 (2013). "In keeping with [that] purpose," a court's inquiry must

12  be " 'especially rigorous when reaching the merits of the dispute would force [it] to decide whether an

13  action taken by one of the other two branches of the Federal Government was unconstitutional.' " *Id.*

14  (*quoting Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)). Under any plausible standard, Debtor has

15  failed to establish any of the three requirements of Article III standing.

16  **1. Debtor cannot identify any injury to a concrete and particularized legally protected interest**

17  **because his grievance is universally shared and generalized in the business environment.**

18      Debtor fails to satisfy the first standing requirement because he asserts a "generalized

19  grievance[s]," not the invasion of a legally protected interest that is concrete and particularized.

20  *Defenders of Wildlife*, 504 U.S. at 575 (*internal quotation marks omitted*); *accord, e.g., Lexmark*

21  *International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125, 127 n.3 (2014). The

22  Supreme Court has made clear that "standing to sue may not be predicated upon an interest . . . which

23  is held in common by all members of the public, because of the necessarily abstract nature of the

24  injury all citizens share." *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 220

25  (1974). "Vindicating the public interest (including the public interest in Government observance of the

26  Constitution and laws) is the function of Congress and the Chief Executive," not private Plaintiff.

27  *Defenders of Wildlife*, 504 U.S. at 576.

28  *///*

1    Debtor's asserted injuries are archetypal generalized grievances. They arise from a diffuse,

2  global phenomenon that affects every other person investing in a business in their communities, in the

3  United States, and throughout the world. ...

4    The redress that Debtor seeks is not focused any more on LYNCH than it is on the remainder

5  of the world's population. Therefore, TANG's alleged injury is too generalized to establish standing.

6  The prohibition against standing based on generalized grievances exists to protect the separation of

7  powers established by the Constitution. *Defenders of Wildlife*, 504 U.S. at 559-60. The constitutional

8  structure cannot be ignored because [Debtor] has identified individual manifestations of obviously

9  universal impacts. While it does not matter how many persons have been injured by the challenged

10  action, the party bringing suit must show that the action injures him in a concrete and personal way.

11  *Massachusetts v. E.P.A.* 127 S.Ct. 1438, 1453 (2007), 549 U.S. 497, 517 (*quoting* 504 U.S. at 581).  In

12  sum, Debtor/Defendant TANG cannot establish a concrete and particularized injury.

13    **2. Debtor has not established that his alleged injuries are caused by the Plaintiff's actions.**

14    Nor can TANG establish that his asserted injuries were caused by the broad, undifferentiated

15  aggregation of the largely unspecified actions he challenges. *See, Defenders of Wildlife*, 504 U.S. at

16  560. A valid causal chain may have several links (so long as they are not hypothetical or tenuous and

17  remain plausible). But, when a CFA's alleged harms may have been caused directly by the conduct of

18  parties other than CFA, as in the instant case (and only alleged indirectly by CFA), it is "substantially

19  more difficult to meet the minimum requirement" of Article III, namely, "to establish that, in fact, the

20  asserted injury was the consequence of the [Creditor's] actions, or that prospective relief will remove

21  the harm." *Warth v. Seldin*, 422 U.S. 490, 504-05 (1975); *accord Defenders of Wildlife*, 504 U.S. at

22  562. However, "[t]his is not to say that [Creditor] may rely on a bare legal conclusion to assert injury-

23  in-fact[.]"  *Maya v. Centex Corp.*, 658 F.3d 1060, 1068. The [Creditor] has the burden of establishing

24  the elements of Article III standing.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

25    Showing causation is especially difficult given the complex interactions in a business

26  environment. In short, TANG has established no valid "causal nexus" between the amorphously

27  described issues challenged by TANG and the specific harms alleged by them.  Plaintiff TANG's

28  description, if considered as such, of the supposed "chain of causation" underscores that it is far too

1 | far too tenuous.

2 | **3. A favorable order cannot redress Debtor/Defendant's alleged injuries.**

3 | Even if Debtor/Defendant could somehow establish injury in fact and causation, they cannot

4 | establish that their asserted injuries likely could be redressed by an order of this Federal Court. *See,*

5 | *Defenders of Wildlife*, 504 U.S. at 560-61. CFA/TANG has not even begun to articulate a remedy

6 | within a federal court's authority to award, much less likely redress their alleged injuries. *See, e.g.,*

7 | *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 42 (1976) (holding that Plaintiff

8 | challenging tax subsidies for hospitals lacked standing where they could only speculate whether a

9 | change in policy would "result in [Debtor] receiving the hospital services they desire"). Here,

10 | Debtor/Defendant TANG speculates that bankruptcy will redress his alleged injury.

11 | For these reasons, Debtor's alleged injuries are not redressable by a district court. For that

12 | reason, and because Debtor/Defendant TANG has established neither injury in fact nor the required

13 | causation, Debtor/Defendant TANG  lacks Article III standing to maintain this action.

14 | **B.    Debtor DEBTOR/DEFENDANT TANG's action is not otherwise a case or controversy**

15 | **cognizable under Article III.**

16 | Quite aside from its fatal flaws with respect to standing, this action simply is not one that a

17 | federal court may entertain consistent with the Constitution.   The "Judicial Power of the United

18 | States," U.S. Const. art. III, § 1, is "one to render dispositive judgments" in "cases and controversies"

19 | as defined by Article III.   *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218-19 (1995) (*internal*

20 | *quotation marks omitted*). That power can "come into play only in matters that were the traditional

21 | concern of the courts at Westminster" and only in "cases and controversies of the sort traditionally

22 | amenable to, and resolved by, the judicial process." *Vermont Agency of Natural Resources v. United*

23 | *States ex rel. Stevens*, 529 U.S. 765, 774 (2000) (*internal quotation marks omitted*). "If a dispute is not

24 | a proper case or controversy, the courts have no business deciding it." *DaimlerChrysler Corp. v. Cuno*,

25 | 547 U.S. 332, 341 (2006).

26 | Debtor's suit is not a case or controversy cognizable under Article III.   Debtor asks the

27 | Bankruptcy Court to review his bankruptcy petition, when he has no standing to act unilaterally in

28 | opposition to his Partner and Plaintiff LYNCH and file for bankruptcy unnecessarily.  This leaves the

1  Court without subject matter jurisdiction.

2       Debtor/Defendant TANG apparently appeals to the Bankruptcy Court's "equitable powers" to

3  justify the action sought here.  But a Federal Court's equitable powers are "subject to restrictions: the

4  suit must be within the traditional scope of equity as historically evolved in the English Court of

5  Chancery." *Guaranty Trust Co. v. York*, 326 U.S. 99, 105 (1945).  Bankruptcy has historically been

6  considered an equitable matter, and bankruptcy courts are considered "courts of equity" and exercise

7  equitable powers under Section 105 of the U.S. Bankruptcy Code.

8       The relief requested by Debtor is plainly not of the sort "traditionally accorded by courts of

9  equity." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).

10  "There simply are certain things that courts, in order to remain courts, cannot and should not do."

11  *Missouri v. Jenkins, 515 U.S. 70, 132* (1995) (Thomas, J., concurring).  Here, Debtor/Defendant

12  TANG is simply dissatisfied with his Partnership with Plaintiff LYNCH and instead of dissolving the

13  Partnership in an equitable manner, TANG physically locks LYNCH out of *their* office, steals

14  LYNCH's extensive personal property (computers and telephone equipment, furniture, personal files,

15  etc.) and files for bankruptcy—despite the fact the business was on its way to turning a profit.  All this

16  by TANG without legal authority nor standing to act unilaterally in such a manner.

17       If a dispute — even one alleging a constitutional violation — is not a proper case or

18  controversy, the federal courts may not decide it. Because this action is categorically not a case or

19  controversy within the meaning of Article III, this Bankruptcy Court lacks jurisdiction to entertain it.

20  **II.  THE  COURT  LACKS  SUBJECT-MATTER  JURISDICTION  WHEN  A  LITIGANT**

21  **LACKS STANDING OR AUTHORITY AND THE ACTION MUST BE DISMISSED**

22       Under Fed. R. Civ. P. 12(b)(1), a court must grant a motion to dismiss if it lacks subject-

23  matter jurisdiction to hear a claim. A motion to dismiss for want of standing is . . . properly brought

24  pursuant to Rule 12(b)(1), because standing is a jurisdictional matter.  Federal courts lack subject-

25  matter jurisdiction over claims asserted by litigants who lack standing. *Hoffman v. Pulido*, 928 F.3d

26  1147, 1151 (9th Cir. 2019), *citing Cetacean Cmty. v.Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) ("A

27  suit brought by a [Debtor] without Article III standing is not a case or controversy, and an Article III

28  federal court therefore lacks subject matter jurisdiction over the suit." (internal quotation marks

1   omitted)).  Debtor/Defendant TANG clearly lacks standing and authority to file bankruptcy.

2   In an analogous case (*Squire Court Partners L.P. v. Credit Enhanced Partners LP Series J* (*In re*

3   *Squire Court Partners L.P.*), 574 B.R. 701 (E.D. Ark. 2017)), the Bankruptcy Court addressed the

4   issue of a Partner filing for bankruptcy when the internal governance required unanimous consent of

5   the Partners.  In *Squire, supra,* "there was a broad delegation of authority to the general partner [as in

6   the instant matter]. However, that was qualified by a retention of the right to decide whether to file

7   bankruptcy based on the unanimous consent of the Partners [as in the instant matter]."  The District

8   Court in *Squire* noted that the authority to file a bankruptcy petition derives from state law. In *Squire,*

9   that meant a combination of the state partnership statute and the limited partnership agreement: Under

10  state law, the partnership agreement governed the relations of the Partners in the partnership. The

11  agreement required unanimous consent, and not all partners consented.  A look at **EXHIBIT A**

12  attached hereto clarifies Partners TANG and LYNCH must act in agreement with each other and

13  cannot amend the Agreement without agreement expressly in writing by both Partners.  (See above ¶¶.

14  22 and 25, e.g.)  In a nutshell, TANG cannot unilaterally file for bankruptcy for Consumer Financial

15  Alliance LLC (CFA).

16      Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action for "lack of

17  subject matter jurisdiction." See FED. R. CIV. P. 12(b)(1).  A Rule 12(b)(1) motion can challenge the

18  sufficiency of the pleadings to establish jurisdiction (facial attack), or a lack of any factual support for

19  subject matter jurisdiction despite the pleading's sufficiency (factual attack). *See Grondal v. United*

20  *States*, 2012 U.S. Dist. LEXIS 19398, at *11-13 (E.D. Wash. Feb. 16, 2012) (Quackenbush, J.). For a

21  facial attack, all allegations are accepted as true. *Id.*  For a factual attack, evidence outside the

22  pleadings needed to resolve factual disputes as to jurisdiction may be considered. *See Assoc. of Am.*

23  *Med. Coll. v. United States*, 217 F.3d 770, 778 (9th Cir. 2000). [Debtor] has the burden of establishing

24  jurisdiction. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)

25      Rule 12(b)(6), in turn, provides for dismissal of an action for "failure to state a claim upon

26  which relief can be granted." *See Fed. R. Civ. P.,* Rule 12(b)(6). For a 12(b)(6) motion, "all well-

27  pleaded allegations of material fact [are accepted as true] and construe[d] in the light most favorable to

28  the non-moving party." *Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012). "[C]onclusory allegations

1  of law and unwarranted inferences" are insufficient. *Associated Gen'l Contractors v. Metro. Water*

2  *Dist.*, 159 F.3d 1178, 1181 (9th Cir. 1998). A complaint must state "evidentiary facts which, if true,

3  will prove [the claim]," *Kendall v. Visa U.S.A.,Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008), otherwise it

4  will be dismissed. *See Watson v. Weeks*, 436 F.3d 1152, 1157 (9th Cir. 2006).

5      Debtor/Defendant TANG is unable to establish this Court's jurisdiction over this case and has

6  failed to advance a claim upon which relief can be granted. Therefore, Plaintiff's Motion to Dismiss

7  should be granted and Debtor/Defendant TANG's filing bankruptcy on behalf of CFA be dismissed.

8                                    **CONCLUSION**

9      For the reasons set forth herein, Plaintiff LYNCH respectfully requests the Court Dismiss the

10  Chapter 7 bankruptcy with prejudice accordingly, as this Court lacks jurisdiction to hear such a claim.

11      December 31, 2019

12                        Respectfully submitted,

13

14                        Thomas Joseph Lynch
                          13681 Newport Ave., Suite 8348
15                        Tustin, CA 92780
                          Telephone: (714) 321-6971
16                        Facsimile: (949) 423-1419
                          Email: thomaslynch1957@gmail.com
17
                          In Pro Per
18

19

20

21

22

23

24

25

26

27

28

15

Plaintiff Lynch's Notice of Motion and MotionTo Dismiss Chapter 7 BK Petiton Pursuant to FRCivP, Rule 12(b)(6)  Case #: 8:19-bk-14600-TA

### DECLARATION OF THOMAS J. LYNCH

I, THOMAS J. LYNCH, Plaintiff in the proceedings at issue declare if called I could and would testify to the following under penalty of perjury:

1.  I am the Plaintiff in this matter.

2.  I deny Consumer Financial Alliance LLC is insolvent.

3.  I deny Consumer Financial Alliance LLC is in need of bankruptcy protection.

4.  I had a business relationship with KEVIN TANG (TANG or Defendant).

5.  My proposal to TANG was to start a minimum Five-Million Dollar net profit per year company would require approximately One Hundred-Fifty Thousand Dollars ($150,000) to become cash positive, which is unheard of in the industry. Only because of LYNCH's cutting-edge model was LYNCH able to achieve such results.

6.  On March 8, 2019 a Partnership Agreement (Agreement; **EXHIBIT A**) was drafted and signed between myself and TANG.

7.  I was emphatic with TANG to change the name of the business from Veritas Financial Solutions LLC, a California Limited Liability Company (Veritas) to Consumer Financial Alliance LLC, a California Limited Liability Company (CFA) because there was another business named Veritas in the industry who I had known the owners for over ten (10) years.

8.  The office address for CFA was at all times 18377 Beach Blvd., Suite 211, Huntington Beach, CA 92648.

9.  The mailing address for CFA is 18377 Beach Blvd., Suite 213, Huntington Beach, CA 92648.

10. On October 13, 2019, I sent an email to TANG requesting payments to 8 notaries' who provided services to CFA.

11. TANG stated that after December 31, 2019, he was not going to put any more money into the partnership and we have until then to get cash positive.

12. On October 31, 2019, I sent a follow up 3rd email to TANG inquiring as to whether he had paid the previous 8 notaries, as I was receiving calls and emails from several notary's who had not received their checks.

13.    On November 17, 2019, I emailed TANG 15 invoices from CFA's lead provider for leads provided to CFA in the preceding month of October 2019.

14.    The same day, TANG sent me a text stating, "tell Bruce we are laying him off. CFA will be closed December 15[th]. You can transfer the clients to you own company".

15.    On November 19, 2019, I tried to access CFA's bank account online, but my access was denied and that TANG had lied to Chase Bank about being sole owner of CFA and had me removed from CFA's company bank account.

16.    On November 19, 2019, I and another employee tried to enter CFA's office only to be physically forced out by TANG.

17.    After the door was slammed in our face, I tried my key to CFA's office and discovered the key had been changed on the front door lock of CFA.

18.    The same day, TANG informed me he was terminating the partnership and filing for bankruptcy as CFA was insolvent.

19.    I made it clear to TANG he had no such authority to file bankruptcy on behalf of CFA and CFA was not insolvent.

20.    On November 21, 2019, I provided the Secretary of State documents to Chase Bank along with the Partnership Agreement demonstrating my 50% ownership and manager status of CFA and Chase immediately reinstated me on CFA's company bank account.

21.    On November 21, 2019, I sent an email to TANG with adjusted expenses demonstrating CFA would be cash positive in December 2019.

22.    I stated to TANG that Pursuant to express language of the Partnership Agreement, TANG had a duty to "provide the initial capital contributions for CFA operating expenses until CFA is cash positive".

23.    The same day, I texted TANG inquiring, "Kevin, please let's work this out. I will find somebody to buy you out. How much would it cost to buy you out?".

24.    TANG responded to my text saying, "If you have $50K upfront we can talk."

25.    On November 22, 2019, TANG forwarded me an email from CFA's sales lead provider with an outstanding invoice for $17,176.00 for leads provided to CFA in the month of October 2019.

26.  Later that day, I called TANG and informed him I was working on refunds with lead provider.

27.  The same day, TANG sent me an email claiming that he was working something out with the lead provider first and for me not to speak with him.

28.  The same day, TANG sent me an email claiming he had made an offer to the lead provider of two-Thousand Dollars ($2,000) to resolve the $17,176.00 past due invoices. Included in that email, TANG stated "All the money coming in will be used to pay current bills first and you get the clients".

29.  The same day, I responded to TANG, "Once we sign a waiver and release then you will NOT be responsible for any liabilities of CFA. I want to keep CFA intact with the clients still under the CFA name and everything the same…and you can withdraw as a partner. DO NOT dissolve CFA."

30.  On November 25, I sent TANG an email stating "I had been working all weekend on the refunds" and attached are the reports demonstrating $11,454.00 of refunds on the $17,176.00 past due invoices with a net balance now owed of only $5,722.

31.  The same day, TANG responded to my email, "I don't care about this. CFA has to be dissolved." In the same email TANG stated, "I cannot allow you to take the company…and run the business while incurring additional debts and exposing me to future liabilities from vendors and from clients if you take the fees without doing the work"…"I have retained an attorney regarding this matter…I will not communicate with you".

32.  The same day, I responded to TANG's email, "I had tried calling your attorney and her voice mail says she will be out of the office until December 6[th] (eleven more days). Pursuant to paragraph 20 of the Partnership Agreement you can 'Withdraw' as a partner and eliminate any future liabilities from vendors and from clients, regardless of how I handle the company moving forward. Or, transfer clients to my other company to service them. I can also get a letter from the lead provider if needed."

33.  Not hearing back from TANG, on December 2, 2019, I sent an email to TANG stating, "I do not have your attorney's email and wanted to get this out to you asap, as time is of the essence. Since you do not want to be partners with me anymore and are concerned about your liability from Consumer Financial Alliance LLC, below is my proposal that will work for the both of us. As you

1   have proposed, "Pay off all outstanding bills and you can have the business" & "Bring the balance

2   current on all the bills and you can have the clients." We dissolve Consumer Financial Alliance LLC

3   (CFA). We then transfer the clients to a new company and I will service them and I will take 100% of

4   the past, present, and future liabilities from all Clients and vendors of CFA. I will sign a Promissory

5   Note under the new company to pay you back 100% of the money you have invested, which will be

6   guaranteed/secured by the existing CFA Client's future fees. You may file a UCC1 against the new

7   company for the money you are owed. As you said, you want to be paid back a minimum $2,500 per

8   month. So, the Promissory Note will state that you shall receive a minimum $2,500 per month and

9   25% from any new clients until you are paid back in full. This way, we both get what we want

10  amicably and the clients are taken care of and will receive the service we promised them."

11      34.   The same day TANG responded to my email stating, "Please do not contact me. You can

12  contact my attorney. The bankruptcy case has been filed. You have to contact the trustee regarding

13  the assets of the estate."

14      35.   Attached to TANG's email was a "Notice of Bankruptcy Case Filing" with a filing date of

15  November 23, 2019 stating a chapter 7 bankruptcy petition was filed on behalf of CFA filed by CFA's

16  attorney TANG.

17      36.   December 2, 2019 was the first time I had become aware of CFA filing a chapter 7

18  bankruptcy petition.

19      37.   Tang had filed bankruptcy on CFA ten (10) days prior without my knowledge or consent.

20      38.   Thereafter, I looked on PACER and found the Bankruptcy Petition for CFA, which

21  included a "Statement Regarding Authority to Sign and File Petition" where TANG states under

22  penalty of perjury, "a special meeting was duly called and held on November 23, 2019" and "it is in

23  the best interests of CFA to file chapter 7 bankruptcy" and TANG "is authorized and directed to

24  execute and deliver all documents necessary to perfect the filing of a chapter 7 voluntary bankruptcy"

25  and TANG "is authorized and directed to appear in all bankruptcy proceedings on behalf of CFA" and

26  TANG "is authorized and directed to employ TANG and the law firm of Tang & Associates to

27  represent CFA in such bankruptcy case".

28      39.   I was never notified, nor did I attend, "a special meeting" on November 23, 2019.

40.    It is NOT in the best interest of CFA to file chapter 7 bankruptcy.

41.    I never agreed to TANG to be authorized and directed to execute and deliver all documents necessary to perfect the filing of a chapter 7 voluntary bankruptcy.

42.    I never agreed to TANG to be authorized and directed to appear in all bankruptcy proceedings on behalf of CFA.

43.    I never agreed to employ TANG, or the law firm of Tang & Associates to represent CFA in such bankruptcy case, as that would be a serious conflict of interest under these circumstances.

I declare under penalty of perjury the foregoing is true and this document was executed in the County of Orange, State of California on the date below.

December 31, 2019

Respectfully submitted,

THOMAS J. LYNCH
Declarant-Plaintiff
Representing Self as a
Layperson-at-Law

///

///

///

# EXHIBIT A

DocuSign Envelope ID: 1B54545A-824B-4511-AC2B-644DB342A0B0

# Partnership Agreement
## Between Thomas J. Lynch and Kevin Tang

This General Partnership Agreement ("This Agreement") between Thomas J. Lynch (hereinafter referred to as "Lynch"), a California resident, and Kevin Tang (hereinafter referred to as "Tang"), a California resident, (hereinafter together referred to as "Partners"); of Consumer Financial Alliance LLC, a California Limited Liability Company, (hereinafter referred to as "CFA.") ("The Partnership") is made as of the 15th day of December, 2018.

### Recitals

The parties have agreed to join together as Partners to the Partnership and to conduct its business in accordance with the provisions of This Agreement.

### Terms of This Agreement

1. **Name and Address.**   The name of the Partnership shall be Consumer Financial Alliance LLC, a California Limited Liability Company, with its principal address located at 18377 Beach Blvd., Suite 213, Huntington Beach, CA 92648.

2. **Purpose.**   The Partnership is organized for the following purpose:
   (a)  To compensate Lynch and Tang for their efforts for starting and maintaining CFA.
   (b)  To determine the percentage amount of contributions, profits and losses, and ownership interest allocated to Lynch and Tang.

The Partners may enter into, make and perform all contracts and all other undertakings and engage in any and all transactions the Partners may deem necessary or advisable to carry out its purposes.

3. **Term and Physical Year.** The Partnership shall continue until terminated pursuant to Section 18 of This Agreement. The physical and taxable year of the Partnership shall end December 31st. Accounting records and books shall be kept on an accrual basis and the fiscal year shall begin on the 1st Day of January and end on 31st Day of December.

4. **Partner's Accounts.** The Partnership shall maintain separate Capital Accounts for each Partner to record each Partner's capital contributions, withdrawals and share of the Partnerships net profits or net losses including unrealized profits and losses calculated in a manner consonant with that of CFA investors.

5. **Capital Contributions.**   The capital contributions by the Partners to The Partnership are as follows:

   Lynch   0%
   Tang   100%

6. **Profits and Losses.**   The Partnership's profits and losses shall be allocated to the Partners in proportion to their capital accounts. The profits and losses by the Partners to The Partnership are as follows:

   Lynch 50%
   Tang   50%

7. **Ownership Interest.** The Partner's ownership interest to The Partnership shall be as follows:
   Lynch 50%
   Tang   50%

DocuSign Envelope ID: 1B54545A-824B-4511-AC2B-644DB342A0B0

8.    Adequate accounting records shall be maintained. Any Partner or their agent, may review any and all accounting records at anytime.

9.    The IRS's general allocation rule shall apply, and profits and losses shall be allocated according to the percent (%) of ownership interest as set out in paragraph #7 above.

10.    At the close of the fiscal year there shall be an annual audit conducted by an accounting firm designated by the Partners.

11.    The first day that The Partnership shall begin is December 15, 2018. The Partnership will continue until the Partners mutually agree to terminate it, or until forced to cease its operations by law.

12.    Both Parties agree that Lynch shall receive an advance recoverable from the partnership profit every month of Five Thousand Dollars ($5,000) for twelve (12) consecutive calendar months starting January 1, 2019. The first date of advancement is January 1, 2019. The total advancement will be deducted from the partnership annual profit sharing at the end of the fiscal year on December 31st, 2019. The full amount of Lynch's advance will be Sixty Thousand Dollars ($60,000). The Five Thousand Dollars ($5,000) per month will be paid to Lynch of Twenty Five Hundred Dollars ($2,500) on the first (1st) and fifteenth (15th) day of every consecutive month, unless the payment date falls on a weekend or holiday, in which case the payment shall be paid on the weekday preceding that weekend or holiday.

13.    Both Tang and Lynch agree that neither Partner will receive their equity distribution until Tang has received his total initial capital contribution paid back in full.

14.    Both Parties agree that they will use CFA's bank account at Chase Bank, bank account # _____. Both Lynch and Tang shall be signers and have full online and full physical access to this account. This account shall be used for the business income from all CFA client servicing.

15.    Management. The management, control and conduct of CFA shall be conducted by both Tang and Lynch. Both Tang and Lynch shall have equal voting rights and authority of CFA.

16.    Additional Partners. Upon written consent of all the Partners, additional Partners may be admitted to The Partnership under such terms and conditions (including capital contributions and profits and losses) as shall be determined at the time by the Partners.

17.    Partner Roles and Responsibilities. The roles and responsibilities of the Partners shall be as follows:

- Lynch shall be President of CFA. Lynch shall establish, administer, and maintain the marketing and sales portion (commonly known as the "front-end") of CFA. The front-end of the Company shall consist of, but not limited to, the sales of potential clients for CFA. Lynch shall establish, administer, manage, and maintain the administrative portion (commonly known as the "back-end") of the Company. The back-end of the Company shall consist of, but not limited to, an intake department, a processing department, compliance department, correspondence department, human resources department, customer service department, and negotiations department. Lynch must devote his efforts full time to maintaining CFA and shall not allocate any time to a competing business as CFA, except for Lynch may devote no more than five (5) hours per week to assisting Robyn Ristin with Financial Solutions Service Center, LLC clients. All CFA leads and clients are property of CFA and Lynch shall not transfer, distribute, share, or sell any CFA leads or clients to anyone.

DocuSign Envelope ID: 1B54545A-824B-4511-AC2B-644DB342A0B0

- Tang shall be Chief Financial Officer (CFO) of CFA. Tang shall establish, administer, manage, and maintain the accounting department. Tang shall provide the initial capital contributions for CFA operating expenses until CFA is cash positive. The capital needed is reflected in Row 31 in the attached projections worksheet titled; "Consumer Financial Alliance LLC Projections BUY LEADS 2-25-19". These expenses shall be for CFA's office space, furniture, facilities (including but not limited to telephones, computers, network access, and internet access), utilities, etc. as necessary for CFA to perform its duties. In addition, Tang shall initially provide the contributions to CFA for purposes of marketing and the purchasing sales leads for CFA. Tang shall initially provide payroll for any employees, independent contractors, agents, or affiliates for the Company. All amounts paid in advance to Lynch by Tang shall be reimbursed to Tang out of Lynch future equity distributions.

18.    Causes For Termination.    The Partnership shall be terminated upon the earlier of:
    18.1    The incompetency, insolvency, or death of all of the Partners;
    18.2    The decree of any court of competent jurisdiction directing the dissolution or termination of The Partnership; or
    18.3    Execution of a written declaration of intention to terminate The Partnership by all of the Partners.

The incompetency, insolvency or death of any one or more of the Partners (but not all Partners) shall not terminate The Partnership.

19.    Assignability of Interests.    The interest of a Partner may be assigned or transferred in whole or in part from one Partner to any other Partner within The Partnership with the written consent of both Tang and Lynch. Except as provided in the preceding sentence, the interest of a Partner may not otherwise be assigned, pledged, hypothecated or transferred under any other circumstances all except by reason of death or incapacity to that Partner's executor or administrator.

20.    Withdrawal by Partners. (a) A Partner may, by notice to each of the other Partners at least seventy-five (75) days prior to the last day of any physical year elect to withdrawal from The Partnership. The withdrawing Partner's Capital Account shall be valued as of the last day of the physical year in which the notice of withdrawal is given. The withdrawing Partner shall be paid the value of that Partner's closing Capital Account in ten (10) equal annual installments (with interest at the average prime interest rate announced from time to time by Bank of America, or its successor in interest, during the preceding physical year) during the ten (10) succeeding physical years of The Partnership, payable on the first business day of the next succeeding physical year and on the first business day of each subsequent succeeding physical year, or in such larger installments and over a shorter period of time as both Tang and Lynch may determine; (b) With approval of both Tang and Lynch, a Partner may, by notice to each of the other Partners at least seventy-five (75) days prior to the last day of any physical year, withdrawal from that Partner's Capital Account a part of the Capital Account as of the first business day of the succeeding physical year.

21.    Liquidation. The Partnership shall be liquidated upon its termination and proceeds thereof applied:
    21.1    First to the payment of the debts, liabilities and obligations of The Partnership and to the costs and expenses of liquidation;
    21.2    To establish such reserves, if any, deemed necessary for any contingent or unforeseen debts, liabilities or obligations of The Partnership and to the costs and expenses of the liquidation;
    21.3    To the pro rata retirement of each Partner's Capital Account. The liquidation shall be

DocuSign Envelope ID: 1B54545A-824B-4511-AC2B-644DB342A0B0

administered jointly by the Partners, except that should any Partner decline to participate, the liquidation shall be administered by the other Partners.

22.    Amendments.    This Agreement may be amended only by the written consent of all of the Partners.

23.    Governing Law.    California law governs this Agreement.    The courts of Orange County, California have exclusive venue and jurisdiction in any controversy relating to or arising out of this Agreement.  Venue for any action shall be in Orange County, California.

24.    Attorneys Fees.    In the event of any litigation arising out of, or relating to this Agreement, the prevailing party shall be entitled to recover its costs and expenses, including its attorney's fees and including those attorneys' fees through the appellate level.  If any provision herein is determined to be illegal or unenforceable, such determination shall not effect the validity or enforceability of the remaining provisions herein, which shall remain in full force and effect.

25.    Entire Agreement.    This Agreement constitutes the entire Agreement between Partners, Lynch and Tang as related to the specific subject matter herein.    There are no additional terms, obligations, covenants, representations, statements, or conditions, other than those contained herein.  No variations or modifications of this Agreement or waivers of the terms or provisions herein shall be deemed valid unless expressly stated in writing and signed by both Partners.

26.  Adequate Time to Consider Agreement.    All Partners acknowledge they have read this Agreement and have had a reasonable period of time to review and consider the Agreement. All Partners acknowledge that they understand all the terms of the Agreement and have knowingly and voluntarily agreed to those terms, which may not be changed without unanimous vote of all Partners.

**Execution**

Intending to be legally bound, the parties executed This Agreement whereupon it entered into full force and effect in accordance with its terms in the County of Orange, State of California.

DocuSigned by:

_Thomas Lynch_

Signature of Thomas J. Lynch

DocuSigned by:

_Kevin Tang_

Signature of Kevin Tang

3/8/2019

Date

3/8/2019

Date

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or proceeding.

My address is: 9572 Dumbreck Drive, Huntington Beach, CA 92646

A true and correct copy of the foregoing document entitled: **PLAINTIFF THOMAS J. LYNCH'S NOTICE OF MOTION AND MOTION TO DISMISS CHAPTER 7 BANKRUPTCY PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE, RULE 12 (b)(6); and DECLARATION OF PLAINTIFF THOMAS J. LYNCH** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**3.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*), I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**2.  SERVED BY UNITED STATES MAIL:**
On, 1/2/20, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Tang & Associates – 18377 Beach Blvd., Suite 211, Huntington Beach, CA 92648
U.S. Trustee (SA) – 411 W 4th St. #7160, Santa Ana, CA 92701
Clerks Office - U.S. Bankruptcy Court, Santa Ana Division, 411 W 4th St., Santa Ana, CA 92701
Hon. Theodor C. Albert - 411 West Fourth Street, Suite 5085, Santa Ana, CA 92701-4593

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on 1/2/20, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Thomas H. Casey (TR) – 22342 Avenida Empresa, Suite 245, Rancho Santa Margarita, CA 92688

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 1-2-20 | Robert Jenkins | |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                   **F 9013-3.1.PROOF.SERVICE**