1    Thomas J. Lynch
    13681 Newport Ave., Suite 8348
2    Tustin, CA 92780
    Telephone: (714) 321-6971
3    Facsimile: (949) 423-1419
    Email: thomaslynch1957@gmail.com
4



FILED

JAN 17 2020

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:      Deputy Clerk

5    Movant-Creditor,
6    Representing himself, as a layperson at law

7

8             **UNITED STATES BANKRUPTCY COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10             **SANTA ANA DIVISION**

11

12    In re

13    CONSUMER FINANCIAL ALLIANCE LLC, a
    California limited liability company,
14

15                   Debtor.
16

17

18

19

20

   Case No. 8:19-bk-14600-TA

   Chapter 7

   **MOVANT CREDITOR THOMAS J.
   LYNCH'S AMENDED NOTICE OF
   MOTION AND MOTION TO DISMISS
   CHAPTER 7 BANKRUPTCY; and
   DECLARATION OF THOMAS J. LYNCH**

   The Honorable **THEODOR C. ALBERT**

   Date:       February 4, 2020
   Time:       11:00 a.m.
   Courtroom:   5B
   Place:       411 West Fourth Street
                Santa Ana, CA 92701

21

22   **TO: ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

23       PLEASE TAKE NOTICE that on February 4, 2020 at 11:00 a.m. in Courtroom 5B of the

24 above-titled Court located at 411 W Fourth St, Santa Ana, CA, Movant-Creditor THOMAS J. LYNCH

25 (LYNCH) will move this Court for an Order dismissing Debtor CONSUMER FINANCIAL

26 ALLIANCE LLC's (CFA), chapter 7 bankruptcy petition filed on November 23, 2019.

27       This Motion will be made on the grounds Kevin Tang (TANG) has no standing, nor authority

28 to file for bankruptcy on behalf of Consumer Financial Alliance LLC.

1    CFA is advised that Local Bankruptcy Rule 9013-1(f) requires a written response to be filed

2  and served at least 14 days before the hearing.

3    This Motion shall be based upon this Notice, the attached Memorandum of Points and

4  Authorities, Declaration of Thomas J. Lynch, the complete files and records of this action, and such

5  other evidence as may be presented at the hearing on this Motion.

6  Dated: January 12, 2020

7                              Respectfully submitted,

8

9

10                             Thomas J. Lynch
                               13681 Newport Ave., Suite 8348
11                             Tustin, CA 92780
                               Telephone: (714) 321-6971
12                             Facsimile: (949) 423-1419
                               Email: thomaslynch1957@gmail.com
13                             Movant-Creditor,
                               Representing himself, as a layperson at law
14
     ///
15
     ///
16
     ///
17

18

19

20

21

22

23

24

25

26

27

28

2

**PRELIMINARY STATEMENT**

Movant-Creditor THOMAS J. LYNCH (LYNCH) brings this motion to dismiss the bankruptcy petition brought by CFA on the grounds Kevin Tang (TANG) has no standing, nor authority, to file for bankruptcy on behalf of Consumer Financial Alliance, LLC. (CFA), as TANG is only a fifty-fifty Partner and has no authority pursuant to a partnership agreement (Agreement), attached hereto as **EXHIBIT A,** entered into by LYNCH and TANG. LYNCH contends the bankruptcy matter must be dismissed, accordingly.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**FACTUAL HISTORY**

After being introduced to LYNCH as a successful business man and thereafter knowing LYNCH for several months and repeatedly commenting on the quality of LYNCH's work in the debt relief services industry, TANG approached LYNCH with a plan. TANG would invest with LYNCH as fifty-fifty Partners, i.e., they would go into business together. A Partnership Agreement (Agreement) was drafted and signed on March 8, 2019 attached hereto as **EXHIBIT A to** Declaration of Thomas J. Lynch ("LYNCH Decl.") ¶ 6). LYNCH agreed to the Partnership and began teaching TANG everything he knew about the industry complexities. One being, the change in the name of the business from Veritas Financial Solutions LLC, a California Limited Liability Company (Veritas) to Consumer Financial Alliance LLC, a California Limited Liability Company (CFA) because LYNCH advised TANG there was another business named Veritas in the industry who LYNCH had known the owners for over ten (10) years, so LYNCH came up with the name of CFA and LYNCH got CFA up and running ("LYNCH Decl.") ¶ 7).

In its pertinent parts, the Agreement makes references to what the Partners—plural—may or may not do. It simply does not allow one of the Partners to act *unilaterally* in such a manner as to request bankruptcy protection. This is especially true when the company is not insolvent and does not need such protection. (LYNCH Decl. ¶¶ 2 & 3). LYNCH had put everything in place and made adjustments so that CFA would have been cash positive in December 2019 attached hereto as **EXHIBIT C to** LYNCH Decl.¶ 21. A look at the Agreement repeatedly demonstrates all Partners must act together:

1     ➤ ¶. 3. The Partnership shall continue until terminated pursuant to Section 18 of This Agreement.

2     ➤ ¶. 7. Ownership Interest. The Partner's ownership interest to The Partnership shall be as

3 follows:  Lynch 50%  Tang 50%

4     ➤ ¶. 11. The Partnership will continue until the Partners mutually agree to terminate it.

5     ➤ ¶. 15.  Management. The management, control and conduct of CFA shall be conducted by both

6 Tang and Lynch. Both Tang and Lynch shall have equal voting rights and authority of CFA.

7     ➤ ¶. 18.  Causes For Termination. The Partnership shall be terminated upon the earlier of:

8       18.1 The incompetency, insolvency, or death of all of the Partners;

9       18.2 The decree of any court of competent jurisdiction directing the dissolution or termination

10 of The Partnership; or

11       18.3 Execution of a written declaration of intention to terminate The Partnership by all of the

12 Partners.

13         The incompetency, insolvency or death of any one or more of the Partners (but not all

14 Partners) shall not terminate The Partnership.

15     ➤ ¶. 19.  Assignability of Interests. The interest of a Partner may be assigned or transferred in

16 whole or in part from one Partner to any other Partner within The Partnership with the written consent

17 of both Tang and Lynch. Except as provided in the preceding sentence, the interest of a Partner may not

18 otherwise be assigned, pledged, hypothecated or transferred under any other circumstances all except

19 by reason of death or incapacity to that Partner's executor or administrator.

20     ➤ ¶. 20.  Withdrawal by Partners.  (a) A Partner may, by notice to each of the other Partners at

21 least seventy-five (75) days prior to the last day of any physical year elect to withdrawal from The

22 Partnership. ...as both Tang and Lynch may determine; (b) With approval of both Tang and Lynch, a

23 Partner may, by notice to each of the other Partners at least seventy-five (75) days prior to the last day

24 of any physical year.

25     ➤ ¶. 22.  Amendments. This Agreement may be amended only by the written consent of all of the

26 Partners.

27     ➤ ¶. 25.  Entire Agreement. This Agreement constitutes the entire Agreement between Partners,

28 Lynch and Tang as related to the specific subject matter herein. There are no additional terms,

1  obligations, covenants, representations, statements, or conditions, other than those contained herein. No

2  modifications of this Agreement or waivers of the terms or provisions herein shall be deemed valid

3  unless expressly stated in writing and signed by both Partners.

4      It is beyond argument that TANG has no authority to act outside the parameters of the

5  Partnership Agreement, without legally dissolving the partnership. The filing for bankruptcy

6  *unilaterally* clearly violates the Agreement and should not be permitted.

7      After only a period of eleven (11) months, LYNCH went to the partnership office of CFA

8  located at 18377 Beach Blvd., Suite 211, Huntington Beach, CA 92648, only to find out he had been

9  locked out. LYNCH and another employee physically attempted to enter, only to be *physically forced*

10  *out by TANG.* (LYNCH Decl. ¶16). After TANG slammed the door on LYNCH, LYNCH tried his key

11  at CFA's office and discovered the key had been changed on the front door lock. (LYNCH Decl. ¶17).

12  On this same day, TANG informed LYNCH that he was terminating the partnership, without the

13  required notice, and filing for bankruptcy. (LYNCH Decl. ¶18). LYNCH attempted to make it clear to

14  TANG at that time that TANG had no such authority, but TANG literally threatened LYNCH, locked

15  him out and commenced these unnecessary proceedings. (LYNCH Decl. ¶19).

16      This is following a flurry of communications between LYNCH and TANG regarding the future

17  of CFA. As previously stated, LYNCH brought a viable business model to TANG. The offer by

18  LYNCH was to start a debt relief services company with TANG. LYNCH's proposal to start a

19  minimum Five-Million Dollar net profit/year company would require approximately One Hundred-

20  Fifty Thousand Dollars to become cash positive, which is unheard of in the industry. Only because of

21  LYNCH's cutting-edge model was LYNCH able to achieve such results.  (LYNCH Decl. ¶ 5).

22      On October 13, 2019, LYNCH sent an email to TANG requesting payments to 8 notaries' who

23  provided services to CFA (LYNCH Decl. ¶ 10). TANG stated to LYNCH and another employee that

24  after December 31, 2019, he was not going to put any more money into the partnership and we have

25  until then to get cash positive (LYNCH Decl. ¶ 11). On October 31, 2019, LYNCH sent a follow up 3rd

26  email to TANG inquiring as to whether he had paid the previous 8 notaries, as LYNCH was receiving

27  calls and emails from several notary's who had not receive their checks, attached as EXHIBIT B to

28  LYNCH Decl. ¶ 12). On November 17, LYNCH emailed TANG 15 invoices from CFA's lead provider

1   for leads provided to CFA in the preceding month of October 2019 attached hereto as **EXHIBIT D** to

2   LYNCH Decl.¶ 13.

3       The same day, TANG sent LYNCH a text stating, "tell Bruce we are laying him off. CFA will

4   be closed December 15th. You can transfer the clients to you own company" (LYNCH Decl. ¶ 14). On

5   November 19, 2019, LYNCH tried to access CFA's bank account online, but his access was denied and

6   that TANG had lied to Chase Bank about being sole owner of CFA and had LYNCH removed from

7   CFA's company bank account (LYNCH Decl. ¶ 15). On November 19, 2019, LYNCH and another

8   employee tried to enter CFA's office only to be physically forced out by TANG (LYNCH Decl. ¶ 16).

9   After the door was slammed in LYNCH's face, LYNCH tried his key to CFA's office and discovered

10  the key had been changed on the front door lock of CFA (LYNCH Decl. ¶ 17). The same day, TANG

11  informed LYNCH he was terminating the partnership and filing for bankruptcy as CFA was insolvent.

12  (LYNCH Decl. ¶ 18). LYNCH made it clear to TANG he had no such authority to file bankruptcy on

13  behalf of CFA and CFA was not insolvent. (LYNCH Decl. ¶ 19). On November 21, 2019, LYNCH

14  provided the Secretary of State documents to Chase Bank along with the Partnership Agreement

15  demonstrating LYNCH's 50% ownership and manager status of CFA and Chase immediately reinstated

16  LYNCH on CFA's company bank account. (LYNCH Decl. ¶ 20).

17      On November 21, 2019, LYNCH sent an email to TANG with adjusted expenses demonstrating

18  CFA would be cash positive in December 2019 (**EXHIBIT C** to LYNCH Decl. ¶ 21). LYNCH stated

19  to TANG that Pursuant to express language of the Partnership Agreement, TANG had a duty to

20  "provide the initial capital contributions for CFA operating expenses until CFA is cash positive"

21  (LYNCH Decl. ¶ 22). The same day, LYNCH texted TANG inquiring, "Kevin, please let's work this

22  out. I will find somebody to buy you out. How much would it cost to buy you out?" (LYNCH Decl. ¶

23  23). TANG responded to LYNCH's text saying, "If you have $50K upfront we can talk." (LYNCH

24  Decl. ¶ 24).

25      On November 22, 2019, TANG forwarded me an email from CFA's sales lead provider with an

26  outstanding invoice for $17,176.00 for leads provided to CFA in the month of October 2019 (LYNCH

27  Decl. ¶ 25). Later that day, LYNCH called TANG and informed him LYNCH was working on refunds

28  with lead provider (LYNCH Decl. ¶ 26). The same day, TANG sent LYNCH an email claiming that

1    TANG was working something out with the lead provider first and for LYNCH not to speak with him.

2    (LYNCH Decl. ¶ 27). The same day, TANG sent LYNCH an email claiming TANG had made an offer

3    to the lead provider of Two-Thousand Dollars ($2,000) to resolve the $17,176.00 past due invoices.

4    Included in that email, TANG stated "All the money coming in will be used to pay current bills first

5    and then you get the clients". (LYNCH Decl. ¶ 28).  The same day, LYNCH responded to TANG,

6    "Once we sign a waiver and release then you will NOT be responsible for any liabilities of CFA. I want

7    to keep CFA intact with the clients still under the CFA name and everything the same…and you can

8    withdraw as a partner. DO NOT dissolve CFA." (LYNCH Decl. ¶ 29).

9         On November 25, LYNCH sent TANG an email stating, "I had been working all weekend on the

10   refunds" and attached are the reports demonstrating $11,454.00 of refunds on the $17,176.00 past due

11   invoices with a net balance now owed of only $5,722, (EXHIBIT D, to LYNCH Decl. ¶ 30).  The same

12   day, TANG responded to LYNCH's email, "I don't care about this. CFA has to be dissolved." In the

13   same email TANG stated, "I cannot allow you to take the company…and run the business while

14   incurring additional debts and exposing me to future liabilities from vendors and from clients if you

15   take the fees without doing the work"…"I have retained an attorney regarding this matter…I will not

16   communicate with you", (EXHIBIT D, to LYNCH Decl. ¶ 31). The same day, LYNCH responded to

17   TANG's email, "I had tried calling your attorney and her voice mail says she will be out of the office

18   until December 6th (eleven more days). Pursuant to paragraph 20 of the Partnership Agreement you can

19   'Withdraw' as a partner and eliminate any future liabilities from vendors and from clients, regardless of

20   how I handle the company moving forward. Or, transfer clients to my other company to service them. I

21   can also get a letter from the lead provider if needed." (LYNCH Decl. ¶ 32).

22        Not hearing back from TANG, on December 2, 2019, LYNCH sent an email to TANG stating, "I

23   do not have your attorney's email and wanted to get this out to you asap, as time is of the essence.

24   Since you do not want to be partners with me anymore and are concerned about your liability from

25   Consumer Financial Alliance LLC, below is my proposal that will work for the both of us. As you have

26   proposed, "Pay off all outstanding bills and you can have the business" & "Bring the balance current on

27   all the bills and you can have the clients." We dissolve Consumer Financial Alliance LLC (CFA). We

28   then transfer the clients to a new company and I will service them and I will take 100% of the past,

1    present, and future liabilities from all Clients and vendors of CFA. I will sign a Promissory Note under

2    the new company to pay you back 100% of the money you have invested, which will be

3    guaranteed/secured by the existing CFA Client's future fees. You may file a UCC1 against the new

4    company for the money you are owed. As you said, you want to be paid back a minimum $2,500 per

5    month. So, the Promissory Note will state that you shall receive a minimum $2,500 per month and 25%

6    from any new clients until you are paid back in full. This way, we both get what we want amicably and

7    the clients are taken care of and will receive the service we promised them." (EXHIBIT E, to LYNCH

8    Decl. ¶ 33). The same day TANG responded to my email stating, "Please do not contact me. You can

9    contact my attorney. The bankruptcy case has been filed. You have to contact the trustee regarding the

10    assets of the estate." (EXHIBIT E to LYNCH Decl. ¶ 34). Also attached to TANG's email was a

11    "Notice of Bankruptcy Case Filing" with a filing date of November 23, 2019 stating a chapter 7

12    bankruptcy petition was filed on behalf of CFA filed by CFA's attorney TANG (EXHIBIT E to

13    LYNCH Decl. ¶ 35). This was the first time LYNCH had become aware of CFA filing a chapter 7

14    bankruptcy petition (LYNCH Decl. ¶ 36). TANG had filed bankruptcy on CFA ten (10) days prior

15    without LYNCH's knowledge or consent (LYNCH Decl. ¶ 37).

16        Shortly thereafter, LYNCH looked online to PACER and found the Bankruptcy Petition for CFA,

17    which included a "Statement Regarding Authority to Sign and File Petition" where TANG states under

18    penalty of perjury, "a special meeting was duly called and held on November 23, 2019" and "it is in the

19    best interests of CFA to file chapter 7 bankruptcy" and TANG "is authorized and directed to execute

20    and deliver all documents necessary to perfect the filing of a chapter 7 voluntary bankruptcy" and

21    TANG "is authorized and directed to appear in all bankruptcy proceedings on behalf of CFA" and

22    TANG "is authorized and directed to employ TANG and the law firm of Tang & Associates to

23    represent CFA in such bankruptcy case" (EXHIBIT F to LYNCH Decl. ¶ 38). LYNCH was never

24    notified, nor did he attend, "a special meeting" on November 23, 2019 (LYNCH Decl. ¶ 39). LYNCH

25    declares it is NOT in the best interest of CFA to file chapter 7 bankruptcy (LYNCH Decl. ¶ 40).

26    LYNCH never agreed to TANG to be authorized and directed to execute and deliver all documents

27    necessary to perfect the filing of a chapter 7 voluntary bankruptcy. (LYNCH Decl. ¶ 41). LYNCH

28    never agreed to TANG to be authorized and directed to appear in all bankruptcy proceedings on behalf

1  of CFA. (LYNCH Decl. ¶ 42). LYNCH never agreed to employ TANG, or the law firm of Tang &

2  Associates to represent CFA

3  in such bankruptcy case, as that would be a serious conflict of interest under these circumstances.

4  (LYNCH Decl. ¶ 43). LYNCH declares CFA is NOT insolvent (LYNCH Decl. ¶ 2).

5        As a direct and proximate result of TANG's material breach of the Partnership Agreement

6  (Agreement), LYNCH incurred additional expenses as follows:

7      1.  TANG failed to pay the 9 notaries owing LYNCH $1,175.00;

8      2.  TANG failed to pay the phone bill owing LYNCH $331.01;

9      3.  TANG failed to pay the Better Business Bureau owing LYNCH $62.00; and

10     4.  TANG failed to pay LYNCH $2,500 on December 1, 2019 and another payment of $2,500 to

11        LYNCH on December, 15, 2019 as expressly required in the Partnership agreement attached

12        hereto as EXHIBIT A.

13        This all totaling $6,568.01, which LYNCH had to pay out of his own pocket making

14  LYNCH now a Creditor of CFA.

15                              **LEGAL STANDARD**

16        To survive a motion to dismiss, "the complaint must contain sufficient factual matter, accepted

17  as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

18  (2009). The complaint must be dismissed if plaintiffs can prove no set of facts in support of their claim

19  which would entitle them to relief. *Kowai v. MCI Commc'ns Corp.,* 16 F.3d 1271, 1266 (D.C. Cir.

20  1994). When considering a motion to dismiss, the court must construe the complaint liberally in the

21  plaintiffs' favor and grant plaintiffs the benefit of all inferences that can be derived from the facts

22  alleged. However, the court "need not accept inferences drawn by plaintiffs if such inferences are

23  unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in

24  the form of factual allegations." *Id.*  In resolving a motion to dismiss, a court "may consider…matters

25  of which [the court] may take judicial notice." *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d

26  621, 624 (D.C. Cir. 1997).  The court may take judicial notice of the physical location and

27  characteristics of the Supreme Court plaza. *See Hodge v. Talkin,* 799 F.3d 1145, 1151 (D.C. Cir. 2015);

28  Fed. R. Evid. 201.

1  A court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim. A

2  motion to dismiss for want of standing is properly brought because standing is a jurisdictional matter.

3  Federal courts lack subject-matter jurisdiction over claims asserted by litigants who lack standing.

4  *Hoffman v. Pulido*, 928 F.3d 1147, 1151 (9th Cir. 2019), *citing Cetacean Cmty. v. Bush*, 386 F.3d 1169,

5  1174 (9th Cir. 2004) ("A suit brought by a plaintiff without Article III standing is not a case or

6  controversy, and an Article III federal court therefore lacks subject matter jurisdiction over the suit."

7  (internal quotation marks omitted)).

**ARGUMENT**

**I. THE COURT LACKS JURISDICTION OVER THIS ACTION**

**A.  TANG lacks U.S. Constitution, Article III standing.**

11  The standing inquiry requires careful judicial examination of a complaint's allegations to

12  ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.

13  *Allen v. Wright*, 468 U.S. at 737, 752 (1984). To demonstrate the requisite Article III standing, Debtor

14  must establish:

15  1.  that they "have suffered an injury in fact — an invasion of a legally protected interest

16  which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical";

17  2.  that the injury is "fairly [traceable] to the challenged action of the defendant,"

18  and not the result of "the independent action of some third party not before the court"; and

19  3.  that it is "likely, as opposed to merely speculative, that the injury will be redressed by a

20  favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (*citations and internal*

21  *quotation marks omitted*). The purpose of these requirements is "to prevent the judicial process from

22  being used to usurp the powers of the political branches." *Clapper v. Amnesty International USA*, 568

23  U.S. 398, 408 (2013). "In keeping with [that] purpose," a court's inquiry must be " 'especially rigorous

24  when reaching the merits of the dispute would force [it] to decide whether an action taken by one of the

25  other two branches of the Federal Government was unconstitutional.' " *Id.*

26  (*quoting Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)). Under any plausible standard, Debtor has failed

27  to establish any of the three requirements of Article III standing.

28  ///

**1. Debtor cannot identify any injury to a concrete and particularized legally protected interest because his grievance is universally shared and generalized in the business environment.**

Debtor fails to satisfy the first standing requirement because he asserts a "generalized grievance[s]," not the invasion of a legally protected interest that is concrete and particularized. *Defenders of Wildlife*, 504 U.S. at 575 (*internal quotation marks omitted*); *accord, e.g., Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125, 127 n.3 (2014). The Supreme Court has made clear that "standing to sue may not be predicated upon an interest . . . which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share." *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 220 (1974). "Vindicating the public interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive," not private Plaintiff. *Defenders of Wildlife*, 504 U.S. at 576.

Debtor's asserted injuries are archetypal generalized grievances. They arise from a diffuse, global phenomenon that affects every other person investing in a business in their communities, in the United States, and throughout the world.

The redress that Debtor seeks is not focused any more on LYNCH than it is on the remainder of the world's population. Therefore, TANG's alleged injury is too generalized to establish standing. The prohibition against standing based on generalized grievances exists to protect the separation of powers established by the Constitution. *Defenders of Wildlife*, 504 U.S. at 559-60. The constitutional structure cannot be ignored because [Debtor] has identified individual manifestations of obviously universal impacts. While it does not matter how many persons have been injured by the challenged action, the party bringing suit must show that the action injures him in a concrete and personal way. *Massachusetts v. E.P.A.* 127 S.Ct. 1438, 1453 (2007), 549 U.S. 497, 517 (*quoting* 504 U.S. at 581). In sum, Debtor cannot establish a concrete and particularized injury.

**2. Debtor has not established that his alleged injuries are caused by the Creditor's actions.**

Nor can TANG establish that his asserted injuries were caused by the broad, undifferentiated aggregation of the largely unspecified actions he challenges. *See, Defenders of Wildlife*, 504 U.S. at 560. A valid causal chain may have several links (so long as they are not hypothetical or tenuous and

1   remain plausible). But, when a CFA's alleged harms may have been caused directly by the conduct of

2   parties other than CFA, as in the instant case (and only alleged indirectly by CFA), it is "substantially

3   more difficult to meet the minimum requirement" of Article III, namely, "to establish that, in fact, the

4   asserted injury was the consequence of the [Creditor's] actions, or that prospective relief will remove

5   the harm." *Warth v. Seldin*, 422 U.S. 490, 504-05 (1975); *accord Defenders of Wildlife*, 504 U.S. at

6   562.  However, "[t]his is not to say that [Creditor] may rely on a bare legal conclusion to assert injury-

7   in-fact[.]" *Maya v. Centex Corp.,* 658 F.3d 1060, 1068. The [Creditor] has the burden of establishing

8   the elements of Article III standing. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

9          Showing causation is especially difficult given the complex interactions in a business

10  environment. In short, Debtor has established no valid "causal nexus" between the amorphously

11  described issues challenged by Debtor and the specific harms alleged by them.  Debtor's description, if

12  considered as such, of the supposed "chain of causation" underscores that it is far too tenuous.

13         **3. A favorable order cannot redress Debtor's alleged injuries.**

14         Even if Debtor could somehow establish injury in fact and causation, they cannot establish that

15  their asserted injuries likely could be redressed by an order of this Federal Court. *See, Defenders of*

16  *Wildlife*, 504 U.S. at 560-61. CFA/TANG has not even begun to articulate a remedy within a federal

17  court's authority to award, much less likely redress their alleged injuries. *See, e.g., Simon v. Eastern*

18  *Kentucky Welfare Rights Organization*, 426 U.S. 26, 42 (1976) (holding that Plaintiff challenging tax

19  subsidies for hospitals lacked standing where they could only speculate whether a change in policy

20  would "result in [Debtor] receiving the hospital services they desire").  Here, Debtor speculates that

21  bankruptcy will redress his alleged injury.

22         For these reasons, Debtor's alleged injuries are not redressable by a district court. For that

23  reason, and because Debtor has established neither injury in fact nor the required causation, Debtor

24  lacks Article III standing to maintain this action.

25  **B. Debtor's action is not otherwise a case or controversy cognizable under Article III.**

26         Quite aside from its fatal flaws with respect to standing, this action simply is not one that a

27  federal court may entertain consistent with the Constitution.  The "Judicial Power of the United States,"

28  U.S. Const. art. III, § 1, is "one to render dispositive judgments" in "cases and controversies" as

1  defined by Article III.  *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218-19 (1995) (*internal quotation*

2  *marks omitted*). That power can "come into play only in matters that were the traditional concern of the

3  courts at Westminster" and only in "cases and controversies of the sort traditionally amenable to, and

4  resolved by, the judicial process." *Vermont Agency of Natural Resources v. United States ex rel.*

5  *Stevens*, 529 U.S. 765, 774 (2000) (*internal quotation marks omitted*). "If a dispute is not a proper case

6  or controversy, the courts have no business deciding it." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332,

7  341 (2006).

8         Debtor's suit is not a case or controversy cognizable under Article III.  Debtor asks the

9  Bankruptcy Court to review his bankruptcy petition, when he has no standing to act unilaterally in

10 opposition to his Partner LYNCH and file for bankruptcy unnecessarily.  This leaves the

11 Court without subject matter jurisdiction.

12        Debtor apparently appeals to the Bankruptcy Court's "equitable powers" to justify the action

13 sought here.  But a Federal Court's equitable powers are "subject to restrictions: the suit must be within

14 the traditional scope of equity as historically evolved in the English Court of Chancery." *Guaranty*

15 *Trust Co. v. York*, 326 U.S. 99, 105 (1945).  Bankruptcy has historically been considered an equitable

16 matter, and bankruptcy courts are considered "courts of equity" and exercise equitable powers under

17 Section 105 of the U.S. Bankruptcy Code.

18        The relief requested by Debtor is plainly not of the sort "traditionally accorded by courts of

19 equity." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).

20 "There simply are certain things that courts, in order to remain courts, cannot and should not do."

21 *Missouri v. Jenkins, 515 U.S. 70, 132* (1995) (Thomas, J., concurring).  Here, Debtor is simply

22 dissatisfied with his Partnership with LYNCH, and instead of dissolving the Partnership in an equitable

23 manner, TANG physically locked LYNCH out of *their* office, steals LYNCH's extensive personal

24 property (computers and telephone equipment, furniture, personal files, etc.) and files for bankruptcy—

25 despite the fact the business was on its way to turning a profit.  All this by TANG without legal

26 authority nor standing to act unilaterally in such a manner.

27        If a dispute — even one alleging a constitutional violation — is not a proper case or controversy,

28 the federal courts may not decide it. Because this action is categorically not a case or controversy

1  within the meaning of Article III, this Bankruptcy Court lacks jurisdiction to entertain it.

2  **II. THE COURT LACKS SUBJECT-MATTER JURISDICTION WHEN A LITIGANT LACKS**

3  **STANDING OR AUTHORITY AND THE ACTION MUST BE DISMISSED**

4      A court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim. A

5  motion to dismiss for want of standing is properly brought because standing is a jurisdictional matter.

6  Federal courts lack subject-matter jurisdiction over claims asserted by litigants who lack standing.

7  *Hoffman v. Pulido*, 928 F.3d 1147, 1151 (9th Cir. 2019), *citing Cetacean Cmty. v.Bush*, 386 F.3d 1169,

8  1174 (9th Cir. 2004) ("A suit brought by a [Debtor] without Article III standing is not a case or

9  controversy, and an Article III federal court therefore lacks subject matter jurisdiction over the suit."

10  (internal quotation marks omitted)).  TANG clearly lacks standing and authority to file bankruptcy.

11  In an analogous case (*Squire Court Partners L.P. v. Credit Enhanced Partners LP Series J (In re*

12  *Squire Court Partners L.P.*), 574 B.R. 701 (E.D. Ark. 2017)), the Bankruptcy Court addressed the issue

13  of a Partner filing for bankruptcy when the internal governance required unanimous consent of the

14  Partners.  In *Squire, supra*, "there was a broad delegation of authority to the general partner [as in the

15  instant matter]. However, that was qualified by a retention of the right to decide whether to file

16  bankruptcy based on the unanimous consent of the Partners [as in the instant matter]."  The District

17  Court in *Squire* noted that the authority to file a bankruptcy petition derives from state law. In *Squire*,

18  that meant a combination of the state partnership statute and the limited partnership agreement: Under

19  state law, the partnership agreement governed the relations of the Partners in the partnership. The

20  agreement required unanimous consent, and not all partners consented.  A look at **EXHIBIT A**

21  attached hereto clarifies Partners TANG and LYNCH must act in agreement with each other and cannot

22  amend the Agreement without agreement expressly in writing by both Partners. (See above ¶¶. 22 and

23  25, e.g.)  In a nutshell, TANG cannot unilaterally file for bankruptcy for Consumer Financial Alliance

24  LLC (CFA).

25      A motion to dismiss can challenge the sufficiency of the pleadings to establish jurisdiction

26  (facial attack), or a lack of any factual support for subject matter jurisdiction despite the pleading's

27  sufficiency (factual attack). *See Grondal v. United States*, 2012 U.S. Dist. LEXIS 19398, at *11-13

28  (E.D. Wash. Feb. 16, 2012) (Quackenbush, J.). For a facial attack, all allegations are accepted as true.

1  *Id.* For a factual attack, evidence outside the pleadings needed to resolve factual disputes as to

2  jurisdiction may be considered. *See Assoc. of Am. Med. Coll. v. United States*, 217 F.3d 770, 778 (9th

3  Cir. 2000). [Debtor] has the burden of establishing jurisdiction. *See Kokkonen v. Guardian Life Ins.*

4  *Co.*, 511 U.S. 375, 377 (1994)

5  A motion to dismiss provides for dismissal of an action for failure to state a claim upon which

6  relief can be granted.   All well-pleaded allegations of material fact [are accepted as true] and

7  construe[d] in the light most favorable to the non-moving party. *See  Padilla v. Yoo*, 678 F.3d 748, 757

8  (9th Cir. 2012). "[C]onclusory allegations of law and unwarranted inferences" are insufficient.

9  *Associated Gen'l Contractors v. Metro. Water Dist.*, 159 F.3d 1178, 1181 (9th Cir. 1998). A complaint

10  must state "evidentiary facts which, if true, will prove [the claim]," *Kendall v. Visa U.S.A., Inc.*, 518

11  F.3d 1042, 1047 (9th Cir. 2008), otherwise it will be dismissed.  *See Watson v. Weeks*, 436 F.3d 1152,

12  1157 (9th Cir. 2006).

13  Debtor is unable to establish this Court's jurisdiction over this case and has failed to advance a

14  claim upon which relief can be granted. Therefore, LYNCH's Motion to Dismiss should be granted and

15  TANG's filing bankruptcy on behalf of CFA be dismissed.

**CONCLUSION**

16

17  For the reasons set forth herein, LYNCH respectfully requests the Court Dismiss the Chapter

18  7 bankruptcy with prejudice accordingly, as this Court lacks jurisdiction to hear such a claim.

19  Dated:  January 12, 2020

20  Respectfully submitted,

21

22

23  Thomas  J. Lynch
     13681 Newport Ave., Suite 8348
     Tustin, CA 92780
     Telephone: (714) 321-6971
     Facsimile: (949) 423-1419
     Email: thomaslynch1957@gmail.com

24

25

26  Movant-Creditor
     Representing himself, as a layperson at law

27

28

1

### DECLARATION OF THOMAS J. LYNCH

2    I, THOMAS J. LYNCH, Declarant-Movant-Creditor in the proceedings at issue declare if called I

3    could and would testify to the following under penalty of perjury:

4        1.    I am the Declarant-Movant-Creditor in this matter.

5        2.    I deny Consumer Financial Alliance LLC is insolvent.

6        3.    I deny Consumer Financial Alliance LLC is in need of bankruptcy protection.

7        4.    I had a business relationship with KEVIN TANG (TANG).

8        5.    My proposal to TANG was to start a minimum Five-Million Dollar net profit per year

9    company would require approximately One Hundred-Fifty Thousand Dollars ($150,000) to become

10   cash positive, which is unheard of in the industry. Only because of LYNCH's cutting-edge model was

11   LYNCH able to achieve such results.

12       6.    On March 8, 2019 a Partnership Agreement (Agreement) was drafted and signed between

13   myself and TANG is attached hereto as **EXHIBIT A.**

14       7.    I was emphatic with TANG to change the name of the business from Veritas Financial

15   Solutions LLC, a California Limited Liability Company (Veritas) to Consumer Financial Alliance LLC,

16   a California Limited Liability Company (CFA) because there was another business named Veritas in

17   the industry who I had known the owners for over ten (10) years.

18       8.    The office address for CFA was at all times 18377 Beach Blvd., Suite 211, Huntington

19   Beach, CA 92648.

20       9.    The mailing address for CFA was at all times 18377 Beach Blvd., Suite 213, Huntington

21   Beach, CA 92648.

22       10.   On October 13, 2019, I sent an email to TANG requesting payments to 8 notaries' who

23   provided services to CFA.

24       11.   TANG stated to myself and another employee that after December 31, 2019, he was not

25   going to put any more money into the partnership and we have until then to get cash positive.

26       12.   On October 31, 2019, I sent a follow up 3rd email to TANG inquiring as to whether he had

27   paid the previous 8 notaries, as I was receiving calls and emails from several notary's who had not

28   received their checks is attached hereto as **EXHIBIT B.**

13. On November 17, 2019, I emailed TANG 15 invoices from CFA's lead provider for leads provided to CFA in the preceding month of October 2019.

14. The same day, TANG sent me a text stating, "tell Bruce we are laying him off. CFA will be closed December 15th. You can transfer the clients to you own company".

15. On November 19, 2019, I tried to access CFA's bank account online, but my access was denied and that TANG had lied to Chase Bank about being sole owner of CFA and had me removed from CFA's company bank account.

16. On November 19, 2019, I and another employee tried to enter CFA's office only to be physically forced out by TANG.

17. After the door was slammed in our face, I tried my key to CFA's office and discovered the key had been changed on the front door lock of CFA.

18. The same day, TANG informed me he was terminating the partnership and filing for bankruptcy as CFA was insolvent.

19. I made it clear to TANG he had no such authority to file bankruptcy on behalf of CFA and CFA was not insolvent.

20. On November 21, 2019, I provided the Secretary of State documents to Chase Bank along with the Partnership Agreement demonstrating my 50% ownership and manager status of CFA and Chase immediately reinstated me on CFA's company bank account.

21. On November 21, 2019, I sent an email to TANG with adjusted expenses demonstrating CFA would be cash positive in December 2019, attached hereto as **EXIHIBIT C**.

22. I stated to TANG that Pursuant to express language of the Partnership Agreement, TANG had a duty to "provide the initial capital contributions for CFA operating expenses until CFA is cash positive".

23. The same day, I texted TANG inquiring, "Kevin, please let's work this out. I will find somebody to buy you out. How much would it cost to buy you out?"

24. TANG responded to my text saying, "If you have $50K upfront we can talk."

25. On November 22, 2019, TANG forwarded me an email from CFA's sales lead provider with an outstanding invoice for $17,176.00 for leads provided to CFA in the month of October 2019.

26. Later that day, I called TANG and informed him I was working on refunds with lead provider.

27. The same day, TANG sent me an email claiming that he was working something out with the lead provider first and for me not to speak with him.

28. The same day, TANG sent me an email claiming he had made an offer to the lead provider of Two-Thousand Dollars ($2,000) to resolve the $17,176.00 past due invoices. Included in that email, TANG stated "All the money coming in will be used to pay current bills first and you get the clients".

29. The same day, I responded to TANG, "Once we sign a waiver and release then you will NOT be responsible for any liabilities of CFA. I want to keep CFA intact with the clients still under the CFA name and everything the same…and you can withdraw as a partner. DO NOT dissolve CFA."

30. On November 25, I sent TANG an email stating "I had been working all weekend on the refunds" and attached are the reports demonstrating $11,454.00 of refunds on the $17,176.00 past due invoices with a net balance now owed of only $5,722, attached hereto as **EXIHIBIT D.**

31. The same day, TANG responded to my email, "I don't care about this. CFA has to be dissolved." In the same email TANG stated, "I cannot allow you to take the company…and run the business while incurring additional debts and exposing me to future liabilities from vendors and from clients if you take the fees without doing the work"…"I have retained an attorney regarding this matter…I will not communicate with you", attached hereto as **EXIHIBIT D.**

32. The same day, I responded to TANG's email, "I had tried calling your attorney and her voice mail says she will be out of the office until December 6th (eleven more days). Pursuant to paragraph 20 of the Partnership Agreement you can 'Withdraw' as a partner and eliminate any future liabilities from vendors and from clients, regardless of how I handle the company moving forward. Or, transfer clients to my other company to service them. I can also get a letter from the lead provider if needed."

33. Not hearing back from TANG, on December 2, 2019, I sent an email to TANG stating, "I do not have your attorney's email and wanted to get this out to you asap, as time is of the essence. Since you do not want to be partners with me anymore and are concerned about your liability from Consumer Financial Alliance LLC, below is my proposal that will work for the both of us. As you have proposed, "Pay off all outstanding bills and you can have the business" & "Bring the balance current on all the

1   bills and you can have the clients." We dissolve Consumer Financial Alliance LLC (CFA). We then

2   transfer the clients to a new company and I will service them and I will take 100% of the past, present,

3   and future liabilities from all Clients and vendors of CFA. I will sign a Promissory Note under the new

4   company to pay you back 100% of the money you have invested, which will be guaranteed/secured by

5   the existing CFA Client's future fees. You may file a UCC1 against the new company for the money

6   you are owed. As you said, you want to be paid back a minimum $2,500 per month. So, the Promissory

7   Note will state that you shall receive a minimum $2,500 per month and 25% from any new clients until

8   you are paid back in full. This way, we both get what we want amicably and the clients are taken care

9   of and will receive the service we promised them." is attached hereto as **EXHIBIT E.**

10      34.  The same day TANG responded to my email stating, "Please do not contact me.  You can

11  contact my attorney.  The bankruptcy case has been filed. You have to contact the trustee regarding the

12  assets of the estate." is attached hereto as **EXHIBIT E.**

13      35.  Attached to TANG's email was a "Notice of Bankruptcy Case Filing" with a filing date of

14  November 23, 2019 stating a chapter 7 bankruptcy petition was filed on behalf of CFA filed by CFA's

15  attorney TANG is attached hereto as **EXHIBIT E.**

16      36.  December 2, 2019 was the first time I had become aware of CFA filing a chapter 7

17  bankruptcy petition.

18      37.  Tang had filed bankruptcy on CFA ten (10) days prior without my knowledge or consent.

19      38.  Thereafter, I looked on PACER and found the Bankruptcy Petition for CFA, which included

20  a "Statement Regarding Authority to Sign and File Petition" where TANG states under penalty of

21  perjury, "the following is a true and correct copy of the resolution adopted by the Managing Member of

22  said LLC". "a special meeting was duly called and held on November 23, 2019" and "it is in the best

23  interests of CFA to file chapter 7 bankruptcy" and TANG "is authorized and directed to execute and

24  deliver all documents necessary to perfect the filing of a chapter 7 voluntary bankruptcy" and TANG

25  "is authorized and directed to appear in all bankruptcy proceedings on behalf of CFA" and TANG "is

26  authorized and directed to employ TANG and the law firm of Tang & Associates to employ TANG and

27  the law firm of Tang & Associates to represent CFA in such bankruptcy case" is attached hereto as

28  EXHIBIT F.

39.  I was never notified, nor did I attend, "a special meeting" on November 23, 2019.

40.  It is NOT in the best interest of CFA to file chapter 7 bankruptcy.

41.  I never agreed to TANG to be authorized and directed to execute and deliver all documents necessary to perfect the filing of a chapter 7 voluntary bankruptcy.

42.  I never agreed to TANG to be authorized and directed to appear in all bankruptcy proceedings on behalf of CFA.

43.  I never agreed to employ TANG, or the law firm of Tang & Associates to represent CFA in such bankruptcy case, as that would be a serious conflict of interest under these circumstances.

I declare under penalty of perjury the foregoing is true and this document was executed in the County of Orange, State of California on the date below.

Dated: January 12, 2020

Respectfully submitted,

THOMAS J. LYNCH
Declarant-Movant- Creditor
Representing Self as a
Layperson-at-Law

///
///
///

# EXHIBIT A

DocuSign Envelope ID: 1B54545A-824B-4511-AC2B-644DB342A0B0

# Partnership Agreement
# Between Thomas J. Lynch and Kevin Tang

This General Partnership Agreement ("This Agreement") between Thomas J. Lynch (hereinafter referred to as "Lynch"), a California resident, and Kevin Tang (hereinafter referred to as "Tang"), a California resident, (hereinafter together referred to as "Partners"); of Consumer Financial Alliance LLC, a California Limited Liability Company, (hereinafter referred to as "CFA.") ("The Partnership") is made as of the 15th day of December, 2018.

## Recitals

The parties have agreed to join together as Partners to the Partnership and to conduct its business in accordance with the provisions of This Agreement.

## Terms of This Agreement

1. **Name and Address.**   The name of the Partnership shall be Consumer Financial Alliance LLC, a California Limited Liability Company, with its principal address located at 18377 Beach Blvd., Suite 213, Huntington Beach, CA 92648.

2. **Purpose.**   The Partnership is organized for the following purpose:
    (a)  To compensate Lynch and Tang for their efforts for starting and maintaining CFA.
    (b)  To determine the percentage amount of contributions, profits and losses, and ownership interest allocated to Lynch and Tang.

The Partners may enter into, make and perform all contracts and all other undertakings and engage in any and all transactions the Partners may deem necessary or advisable to carry out its purposes.

3. **Term and Physical Year.** The Partnership shall continue until terminated pursuant to Section 18 of This Agreement. The physical and taxable year of the Partnership shall end December 31st. Accounting records and books shall be kept on an accrual basis and the fiscal year shall begin on the 1st Day of January and end on 31st Day of December.

4. **Partner's Accounts.** The Partnership shall maintain separate Capital Accounts for each Partner to record each Partner's capital contributions, withdrawals and share of the Partnerships net profits or net losses including unrealized profits and losses calculated in a manner consonant with that of CFA investors.

5. **Capital Contributions.**   The capital contributions by the Partners to The Partnership are as follows:

Lynch   0%
Tang   100%

6. **Profits and Losses.**   The Partnership's profits and losses shall be allocated to the Partners in proportion to their capital accounts. The profits and losses by the Partners to The Partnership are as follows:

Lynch 50%
Tang   50%

7. **Ownership Interest.** The Partner's ownership interest to The Partnership shall be as follows:
Lynch 50%
Tang   50%



DocuSign Envelope ID: 1B54545A-824B-4511-AC2B-644DB342A0B0

8.      Adequate accounting records shall be maintained. Any Partner or their agent, may review any and all accounting records at anytime.

9.      The IRS's general allocation rule shall apply, and profits and losses shall be allocated according to the percent (%) of ownership interest as set out in paragraph #7 above.

10.     At the close of the fiscal year there shall be an annual audit conducted by an accounting firm designated by the Partners.

11.     The first day that The Partnership shall begin is December 15, 2018. The Partnership will continue until the Partners mutually agree to terminate it, or until forced to cease its operations by law.

12.     Both Parties agree that Lynch shall receive an advance recoverable from the partnership profit every month of Five Thousand Dollars ($5,000) for twelve (12) consecutive calendar months starting January 1, 2019. The first date of advancement is January 1, 2019. The total advancement will be deducted from the partnership annual profit sharing at the end of the fiscal year on December 31st, 2019. The full amount of Lynch's advance will be Sixty Thousand Dollars ($60,000). The Five Thousand Dollars ($5,000) per month will be paid to Lynch of Twenty Five Hundred Dollars ($2,500) on the first (1st) and fifteenth (15th) day of every consecutive month, unless the payment date falls on a weekend or holiday, in which case the payment shall be paid on the weekday preceding that weekend or holiday.

13.     Both Tang and Lynch agree that neither Partner will receive their equity distribution until Tang has received his total initial capital contribution paid back in full.

14.     Both Parties agree that they will use CFA's bank account at Chase Bank, bank account # _____. Both Lynch and Tang shall be signers and have full online and full physical access to this account. This account shall be used for the business income from all CFA client servicing.

15.     Management. The management, control and conduct of CFA shall be conducted by both Tang and Lynch. Both Tang and Lynch shall have equal voting rights and authority of CFA.

16.     Additional Partners. Upon written consent of all the Partners, additional Partners may be admitted to The Partnership under such terms and conditions (including capital contributions and profits and losses) as shall be determined at the time by the Partners.

17.     Partner Roles and Responsibilities. The roles and responsibilities of the Partners shall be as follows:
- Lynch shall be President of CFA. Lynch shall establish, administer, and maintain the marketing and sales portion (commonly known as the "front-end") of CFA. The front-end of the Company shall consist of, but not limited to, the sales of potential clients for CFA. Lynch shall establish, administer, manage, and maintain the administrative portion (commonly known as the "back-end") of the Company. The back-end of the Company shall consist of, but not limited to, an intake department, a processing department, compliance department, correspondence department, human resources department, customer service department, and negotiations department. Lynch must devote his efforts full time to maintaining CFA and shall not allocate any time to a competing business as CFA, except for Lynch may devote no more than five (5) hours per week to assisting Robyn Ristin with Financial Solutions Service Center, LLC clients. All CFA leads and clients are property of CFA and Lynch shall not transfer, distribute, share, or sell any CFA leads or clients to anyone.

DocuSign Envelope ID: 1B54545A-824B-4511-AC2B-644DB342A0B0

- Tang shall be Chief Financial Officer (CFO) of CFA. Tang shall establish, administer, manage, and maintain the accounting department. Tang shall provide the initial capital contributions for CFA operating expenses until CFA is cash positive. The capital needed is reflected in Row 31 in the attached projections worksheet titled; "Consumer Financial Alliance LLC Projections BUY LEADS 2-25-19". These expenses shall be for CFA's office space, furniture, facilities (including but not limited to telephones, computers, network access, and internet access), utilities, etc. as necessary for CFA to perform its duties. In addition, Tang shall initially provide the contributions to CFA for purposes of marketing and the purchasing sales leads for CFA. Tang shall initially provide payroll for any employees, independent contractors, agents, or affiliates for the Company. All amounts paid in advance to Lynch by Tang shall be reimbursed to Tang out of Lynch future equity distributions.

18. Causes For Termination.    The Partnership shall be terminated upon the earlier of:
    18.1  The incompetency, insolvency, or death of all of the Partners;
    18.2  The decree of any court of competent jurisdiction directing the dissolution or termination of The Partnership; or
    18.3  Execution of a written declaration of intention to terminate The Partnership by all of the Partners.

The incompetency, insolvency or death of any one or more of the Partners (but not all Partners) shall not terminate The Partnership.

19. Assignability of Interests.    The interest of a Partner may be assigned or transferred in whole or in part from one Partner to any other Partner within The Partnership with the written consent of both Tang and Lynch.  Except as provided in the preceding sentence, the interest of a Partner may not otherwise be assigned, pledged, hypothecated or transferred under any other circumstances all except by reason of death or incapacity to that Partner's executor or administrator.

20. Withdrawal by Partners.  (a) A Partner may, by notice to each of the other Partners at least seventy-five (75) days prior to the last day of any physical year elect to withdrawal from The Partnership.  The withdrawing Partner's Capital Account shall be valued as of the last day of the physical year in which the notice of withdrawal is given.  The withdrawing Partner shall be paid the value of that Partner's closing Capital Account in ten (10) equal annual installments (with interest at the average prime interest rate announced from time to time by Bank of America, or its successor in interest, during the preceding physical year) during the ten (10) succeeding physical years of The Partnership, payable on the first business day of the next succeeding physical year and on the first business day of each subsequent succeeding physical year, or in such larger installments and over a shorter period of time as both Tang and Lynch may determine; (b) With approval of both Tang and Lynch, a Partner may, by notice to each of the other Partners at least seventy-five (75) days prior to the last day of any physical year, withdrawal from that Partner's Capital Account a part of the Capital Account as of the first business day of the succeeding physical year.

21. Liquidation. The Partnership shall be liquidated upon its termination and proceeds thereof applied:
    21.1  First to the payment of the debts, liabilities and obligations of The Partnership and to the costs and expenses of liquidation;
    21.2  To establish such reserves, if any, deemed necessary for any contingent or unforeseen debts, liabilities or obligations of The Partnership and to the costs and expenses of the liquidation;
    21.3  To the pro rata retirement of each Partner's Capital Account.  The liquidation shall be

DocuSign Envelope ID: 1B54545A-824B-4511-AC2B-644DB342A0B0

administered jointly by the Partners, except that should any Partner decline to participate, the liquidation shall be administered by the other Partners.

22.    Amendments.    This Agreement may be amended only by the written consent of all of the Partners.

23.    Governing Law.    California law governs this Agreement.    The courts of Orange County, California have exclusive venue and jurisdiction in any controversy relating to or arising out of this Agreement.    Venue for any action shall be in Orange County, California.

24.    Attorneys Fees.    In the event of any litigation arising out of, or relating to this Agreement, the prevailing party shall be entitled to recover its costs and expenses, including its attorney's fees and including those attorneys' fees through the appellate level.    If any provision herein is determined to be illegal or unenforceable, such determination shall not effect the validity or enforceability of the remaining provisions herein, which shall remain in full force and effect.

25.    Entire Agreement.    This Agreement constitutes the entire Agreement between Partners, Lynch and Tang as related to the specific subject matter herein.    There are no additional terms, obligations, covenants, representations, statements, or conditions, other than those contained herein.    No variations or modifications of this Agreement or waivers of the terms or provisions herein shall be deemed valid unless expressly stated in writing and signed by both Partners.

26.    Adequate Time to Consider Agreement.    All Partners acknowledge they have read this Agreement and have had a reasonable period of time to review and consider the Agreement. All Partners acknowledge that they understand all the terms of the Agreement and have knowingly and voluntarily agreed to those terms, which may not be changed without unanimous vote of all Partners.

**Execution**

Intending to be legally bound, the parties executed This Agreement whereupon it entered into full force and effect in accordance with its terms in the County of Orange, State of California.

| | |
|---|---|
| *Thomas Lynch* | *Kevin Tang* |
| Signature of Thomas J. Lynch | Signature of Kevin Tang |
| 3/8/2019 | 3/8/2019 |
| Date | Date |

# EXHIBIT B

**Thomas J. Lynch**

Subject:                      FW: *** UPDATED*** F2F Payments 10-31-19 with Client Names

**From:** Thomas J. Lynch [mailto:TLynch@ConsumerFinancialAlliance.org]
**Sent:** Saturday, November 16, 2019 12:44 PM
**To:** 'Kevin Tang'; 'jvalenzuela@consumerfinancialalliance.org'; 'rristin@consumerfinancialalliance.org'
**Subject:** FW: *** UPDATED*** F2F Payments 10-31-19 with Client Names

Kevin,

Did you pay the F2F reps below? I am receiving emails and phone calls from some of these F2F reps who are claiming they did not receive their check yet. Please confirm when they have been paid. Thank you

Sincerely,



**Thomas J. Lynch, President**
*Consumer Financial Alliance*
*Phone: 714-705-6440, Ext 101*
*Fax: 714-705-6454*
*Email: TLynch@ConsumerFinancialAlliance.org*
*Website: www.ConsumerFinancialAlliance.org*

**See our A+ rating with the Better Business Bureau** - Click Here

The information contained in this e-mail message, including any attachments is for the sole use of the intended recipient(s) and may contain privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

**From:** Thomas J. Lynch [mailto:tlynch@consumerfinancialalliance.org]
**Sent:** Wednesday, November 6, 2019 10:34 AM
**To:** 'Kevin Tang'; 'Judith Valenzuela'; rristin@consumerfinancialalliance.org
**Subject:** RE: *** UPDATED*** F2F Payments 10-31-19 with Client Names

Kevin,

In the report titled CFA Clients 9-16-19 in a Dropbox folder titled CFA Reports the column B with the client's name the color Green means the clients have retained and are active. The color yellow means they have missed the F2F and need to re-schedule the F2F, or they have completed the F2F but documents are missing such as the ████████Contract or a Voided Check. Robyn has a report from████████████which gives us the 1st draft date and she has updated the CFA Clients worksheet in column D. Robyn is looking at████████████for reports that can be generated. Also could you please add Robyn as a user and email her an invite for Monday's. Robyn's email is rristin@consumerfinancialalliance.org Below are answers to your questions:

For each of these, please indicate as follow:
1. Did they retained?
2. Did Robin uploaded docs to ████?
3. When is payment scheduled for?

1.   Jose E████- Mail $100 to Paulette████at████████Ave., Bronx, NY 10469

1

(1) Yes
(2) Yes
(3) 8-25-19

2. Emilie C████████ - Mail $75 to Lisa████at ████████Blvd., #148, Hayward, CA 94541

   (1) Yes
   (2) Yes
   (3) 9-1-19

3. George█████ - Mail $140 to Debra█████at ██████████Rd, Winchester, VA 22602

   (1) No – Missed the F2F twice and have been unable to reach him.
   (2) No
   (3) N/A

4. Robert████████ - Mail $50 to Harro████████at ██████████ # 171, Sylmar, CA 91342

   (1) Yes
   (2) Yes
   (3) 10-7-19

5. Micki█████ - Mail $80 to Javanna█████at█████████Lane, Palmdale, CA 93552

   (1) Yes
   (2) Yes
   (3) 10-17-19

6. Mohammad████████ - Mail $75 to Rhonda████at █████████Dr. N, Apt.106, Margate, FL 33063

   (1) Yes
   (2) Yes
   (3) 10-17-19

7. Dale█████ - Mail $75 to Monica█████████at█████████Lane, Orange Park, FL 32073

   (1) Yes, but waiting for a voided check and a signature was missing on the bottom of████
   agreement, which we should send it to him via DocuSign
   (2) No
   (3) N/A

8. Nentita████████ - Mail $100 to Steven B████████at █████████ Penthouse, Encino, CA 91436

   (1) Yes
   (2) Yes
   (3) 11-18-19

9. Fabiola R████████ - Mail $125 to Christian B█████at █████████ Anaheim, CA 92814

(1) Yes
(2) Yes
(3) 11-8-19

10. Anna ███── Mail $75 to Stephen███ at ████████St. ,Oklahoma City, OK 73116

(1) Yes
(2) Yes
(3) 11-1-19

11. Steven████████── Mail $80 to Michael █████at ███████, #3981, Birmingham, AL 35208

(1) Yes
(2) Yes
(3) 11-15-19

12. Terrence██████── Mail $80 to Robyn██████ at ████████Pl., Victorville, CA 92395

(1) No – did not show for the F2F and I have been able to reach him to reschedule.
(2) No
(3) N/A

13. Sandra████████── Mail $50 to Gail███████at ███████████Boca Raton, FL 33432

(1) Yes
(2) Yes
(3) 11-6-19

**From:** Kevin Tang [mailto:tangkevin911@gmail.com]
**Sent:** Wednesday, November 06, 2019 3:19 AM
**To:** Thomas J. Lynch; Judith Valenzuela
**Subject:** Re: *** UPDATED*** F2F Payments 10-31-19 with Client Names

For each of these, please indicate as follow:
1. Did they retained?
2. Did Robin uploaded docs to ████?
3. When is payment scheduled for?

On Thu, Oct 31, 2019 at 4:08 PM Thomas J. Lynch <tlynch@consumerfinancialalliance.org> wrote:

Kevin,

Below are the F2F reps we need to pay with the client name listed first. I have created a report titled CFA Clients in a Dropbox folder titled CFA Reports.

1. Jose██████── Mail $100 to Paulette███████at ████████Ave., Bronx, NY 10469

2. Emilie ████████── Mail $75 to Lisa████at ████████, #148, Hayward, CA 94541

3. George███████── Mail $140 to Debra ████at ████████████Winchester, VA 22602

3



4. Robert ███████ - Mail $50 to Harroll ███████ at ███████ # 171, Sylmar, CA 91342

5. Micki ████ - Mail $80 to Javanna ████ at ███████ Palmdale, CA 93552

6. Mohammad ███████ - Mail $75 to Rhonda ████ at ███████. N, Apt.106, Margate, FL 33063

7. Dale ████ - Mail $75 to Monica ███████ at ███████ Orange Park, FL 32073

8. Nentita ███████ - Mail $100 to Steven B ████ at ███████ Penthouse, Encino, CA 91436

9. Fabiola F ████ - Mail $125 to Christian ███████ at ███████ Anaheim, CA 92814

10. Anna ████ - Mail $75 to Stephen ████ at 3███████, Oklahoma City, OK 73116

11. Steven ███████ - Mail $80 to Michael C ████ at ███████ #3981, Birmingham, AL 35208

12. Terrence ███████ - Mail $80 to Robyn ███████ at ███████, Victorville, CA 92395

13. Sandra ███████ - Mail $50 to Gail ████ at ███████ Boca Raton, FL 33432

Sincerely,



***Thomas J. Lynch, President***
*Consumer Financial Alliance*
*Phone: 714-705-6440, Ext 101*
*Fax: 714-705-6454*
*Email: TLynch@ConsumerFinancialAlliance.org*
*Website: www.ConsumerFinancialAlliance.org*

**See our A+ rating with the Better Business Bureau** - <u>Click Here</u>

The information contained in this e-mail message, including any attachments is for the sole use of the intended recipient(s) and may contain privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

EXHIBIT C

**Thomas J. Lynch**

Subject:                          FW: We Need to Get Everthing Right

**From:** Thomas J. Lynch [mailto:TLynch@ConsumerFinancialAlliance.org]
**Sent:** Thursday, November 21, 2019 9:02 AM
**To:** 'ktang@consumerfinancialalliance.org'; 'tangkevin911@gmail.com'
**Subject:** We Need to Get Everthing Right

Kevin,

I am extremely appalled at the way you have handled our partnership. From the beginning, we were supposed to be 50/50 partners in my debt settlement model, i.e., you put in the money and I do all the work. From the start, you attempted to cut the necessary amount of capital that you was required to commit to the partnership. I presented you a model to start a debt settlement company for approx. $150K, which is unheard of. Debt Settlement Companies are a minimum $5M net profit companies annually. Please do your research and speak to the alleged people who said, "I cannot be trusted". I have never lied or misrepresented anything to you.

Several months ago, you started mentioning you wanted to stick to the express language in our Partnership Agreement, where you were not obligated to pay my $5K monthly nut, nor put any more money into the business after December 31, 2019. I have been working on a spreadsheet demonstrating we are cash positive in December 2019. Below are the numbers where we can cut expenses and work out the house:

|                              | 12/1/2019 | 1/1/2020 | 2/1/2020 |
|------------------------------|-----------|----------|----------|
| **Ringcentral**              | $410      | $410     | $410     |
| **F2F Rep**                  | $600      | $600     | $600     |
| ▇▇▇▇▇▇▇                       | $2,500    | $2,500   | $2,500   |
| **Frontier**                 | $0        | $0       | $0       |
| **Fictitious Bus.Name/BBB**  | $51       | $51      | $51      |
| **Velocify**                 | $0        | $0       | $0       |
| **Payroll**                  | $2,500    | $2,500   | $2,500   |
| **Tom**                      | 5000      | 5000     | 5000     |
| Total Expenses               | $11,061   | $11,061  | $11,061  |
| **Fees of drafting clients** | $12,326   | $13,068  | $11,166  |

Sincerely,



**Thomas J. Lynch, President**
**Consumer Financial Alliance**
Phone: 714-705-6440, Ext 101
Fax: 714-705-6454
Email: TLynch@ConsumerFinancialAlliance.org
Website: www.ConsumerFinancialAlliance.org

**See our A+ rating with the Better Business Bureau - Click Here**

The information contained in this e-mail message, including any attachments is for the sole use of the intended recipient(s) and may contain privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

# EXHIBIT D

**Thomas J. Lynch**

**Subject:**          FW: Velocify Reporting and Quote Velocity Refunds

**From:** Kevin Tang [mailto:tangkevin911@gmail.com]
**Sent:** Monday, November 25, 2019 2:04 PM
**To:** Thomas J. Lynch
**Subject:** Re: Velocify Reporting and ████████ Refunds

I don't care about this.  CFA has to be dissolved.  Under the partnership agreement paragraph 13, no one take any distributions of profit until I am paid back in full.  I cannot allow you to take the company that I have 50% interest in and that owes  me $140,000 and run the business while incurring additional debts and exposing me to future liabilities from vendors and from clients if you take the fees without doing the work.  I have retained an attorney regarding this matter.  Her name is Krystina Tran.  I will not communicate with you.  You can call her if you want to discuss this matter.  A

Law Offices of Tran & Iserhien, PC

17011 Beach Blvd Ste 830, Huntington Beach, CA 92647

Phone: (949) 797-9090

On Mon, Nov 25, 2019 at 12:48 PM Thomas J. Lynch <TLynch@consumerfinancialalliance.org> wrote:

Kevin,

I worked all weekend on getting the reporting set up in Velocify to check for refunds on the leads from ████████ I have attached the refund reports demonstrating refunds for Live Transfers Incoming Calls and have gotten through the refunds for calls we were billed for that were under 3 minutes. There are other calls I am having to listen to that state the call was a little over 3 minutes in the attached sheets (Column E titled "Call Length", but when I go to the actual recordings, it says the call was under 3 minutes. I should have the refunds finished today, as there are quite a few recordings I still have to listen to for more refunds and for check for Duplicate Leads also which I have already done on one report below Also, I am checking for refunds on the Real Time Form Leads for disconnected phone numbers and wrong person, or did not sign up. I have put the refund amounts in the comments in Cell A1 the attached sheets and listed the comments below. So far, there looks like a lot of refunds!

 Once these refunds are applied, it will reduce the $138K you have invested and reduce lead cost moving forward and we will definitely be cash positive. I am still working on the refunds and will be comparing the refunds to the invoices. I will send you updated worksheets asap.

1.  "CFA-Ringba_20191021-20191117 REFUNDS" - Billed $9,020, Refund $5,445 under 3 min

2.  "CFA-Ringba_20190906-20191018 REFUNDS" - Billed $5,665, Refund $385 for under 3 minutes, LOOK AT THIS REPORT BECAUSE ████████ DID NOT CHARGE FOR MOST OF CALLS UNDER 3 MINUTES!

3.  "CFA-2019.07.22-2019.08.09 REFUNDS" - Billed $2,310,  Refund of $990 for under 3 min

4.  "CFA_Calls_2019 05 27-2019 06 02(24) REFUNDS" - Billed $1,320. Refund $440 for under 3 min and Refund $385 for Duplicates

1

5.  "CFA_Calls_2019.04.27-2019.05.19(191) REFUNDS"  - Billed $10,505. Refund $3,245 for under 3 min

6.  "Velocify Real Time Web Leads all time" - Billed $1,200, Refund  $564 for bad phone number or wrong name, did not sign up

Sincerely,



**Thomas J. Lynch, President**
**Consumer Financial Alliance**
*Phone: 714-705-6440, Ext 101*
*Fax: 714-705-6454*
*Email: TLynch@ConsumerFinancialAlliance.org*
*Website: www.ConsumerFinancialAlliance.org*

**See our A+ rating with the Better Business Bureau** - <u>Click Here</u>

The information contained in this e-mail message, including any attachments is for the sole use of the intended recipient(s) and may contain privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

2

# EXHIBIT E

**Thomas J. Lynch**

| | |
|---|---|
| **Subject:** | FW: Dissolution of Consumer Financial Alliance LLC -1152 CEC: FOR SETTLEMENT PURPOSES ONLY |
| **Attachments:** | notice of bk.pdf |

**From:** Kevin Tang [mailto:kevin@tang-associates.com]
**Sent:** Monday, December 2, 2019 1:12 PM
**To:** Thomas J. Lynch
**Subject:** Re: Dissolution of Consumer Financial Alliance LLC -1152 CEC: FOR SETTLEMENT PURPOSES ONLY

Please do not contact me.  You can contact my attorney.  The bankruptcy case has been filed.  You have to contact the trustee regarding the assets of the estate.

On Mon, Dec 2, 2019 at 1:08 PM Thomas J. Lynch <tlynch@consumerfinancialalliance.org> wrote:

Kevin,

I do not have your attorney's email and wanted to get this out to you asap, as time is of the essence.

Since you do not want to be partners with me anymore and are concerned about your liability from Consumer Financial Alliance, LLC, below is my proposal that will work for the both of us.

As you have proposed, "Pay off all outstanding bills and you can have the business" & "Bring the balance current on all the bills and you can have the clients." Since I do not have the money to pay the current bills, I will have M███ sign an agreement with you releasing you of the $17,176.00. And the fees that just came in to CFA can be used to pay the outstanding face-to-face costs ($1,205) and all other outstanding bills. **Please let me know the total amount of the outstanding bills minus the $17K** M███ **claims we owe him.**

We dissolve Consumer Financial Alliance, LLC (CFA). We then transfer the clients to a new company and I will service them and I will take 100% of the past, present, and future liabilities from all Clients and vendors of CFA.

I will sign a Promissory Note under the new company to pay you back 100% of the money you have invested, which will be guaranteed/secured by the existing CFA Client's future fees. You may file a UCC1 against the new company for the money you are owed.

You said you have invested $138,000 minus $22,233.54 (Fees already received) = $115,766.46 you are owed. There are $174,332.84 of remaining fees coming in from the existing CFA client data base (Remaining Fees)(See attached "CFA Client List for Fees") . As you said, you want to be paid back a minimum $2,500 per month. So, the Promissory Note will state that you shall receive a minimum $2,500 per month and 25% from any new clients until you are paid back in full.

This way, we both get what we want amicably and the clients are taken care of and will receive the service we promised them.

Please get back to me asap.

Sincerely,



**Thomas J. Lynch, President**
*Consumer Financial Alliance*
Phone: 714-705-6440, Ext 101
Fax: 714-705-6454
Email: TLynch@ConsumerFinancialAlliance.org
Website: www.ConsumerFinancialAlliance.org

1

United States Bankruptcy Court
Central District of California

**Notice of Bankruptcy Case Filing**

A bankruptcy case concerning the debtor(s) listed below was
filed under Chapter 7 of the United States Bankruptcy Code,
entered on 11/23/2019 at 09:09 AM and filed on 11/23/2019.

**FILED**
**11/23/2019**
**09:09 AM**

**Consumer Financial Alliance LLC**
18377 Beach Blvd., Sute 213
Huntington Beach, CA 92648
Tax ID / EIN: 83-2557929
*fdba* **Vertias Financial Solutions LLC**

The case was filed by the debtor's attorney:

**Kevin Tang**
Tang & Associates
18377 Beach Blvd
Suite 211
Huntington Beach, CA 92648
714-594-7022

The bankruptcy trustee is:

**Thomas H Casey (TR)**
22342 Avenida Empresa, Suite 245

Rancho Santa Margarita, CA 92688

(949) 766-8787

The case was assigned case number 8:19-bk-14600-TA to Judge Theodor Albert.

In most instances, the filing of the bankruptcy case automatically stays certain collection and other
actions against the debtor and the debtor's property. Under certain circumstances, the stay may be
limited to 30 days or not exist at all, although the debtor can request the court to extend or impose a stay.
If you attempt to collect a debt or take other action in violation of the Bankruptcy Code, you may be
penalized. Consult a lawyer to determine your rights in this case.

If you would like to view the bankruptcy petition and other documents filed by the debtor, they are
available at our *Internet* home page www.cacb.uscourts.gov or at the Clerk's Office, 411 West Fourth
Street, Suite 2030,, Santa Ana, CA 92701-4593.

You may be a creditor of the debtor. If so, you will receive an additional notice from the court setting
forth important deadlines.

**Kathleen J. Campbell**
**Clerk, U.S. Bankruptcy**
**Court**

| PACER Service Center |
|---|
| Transaction Receipt |
| |

# EXHIBIT F

# United States Bankruptcy Court
### Central District of California

In re   __Consumer Financial Alliance LLC_____
    Debtor(s)

Case No. _____

Chapter   __7_____

# STATEMENT REGARDING AUTHORITY TO SIGN AND FILE PETITION

I, Kevin Tang, declare under penalty of perjury that I am the Chief Financial Officer of Consumer Financial Alliance LLC, and that the following is a true and correct copy of the resolutions adopted by the Managing Member of said limited liability company at a special meeting duly called and held on the __23__ day of __November__ , __2019__ .

"Whereas, it is in the best interest of this limited liability company to file a voluntary petition in the United States Bankruptcy Court pursuant to Chapter 7 of Title 11 of the United States Code;

Be It Therefore Resolved, that Kevin Tang, Chief Financial Officer of this limited liability company, is authorized and directed to execute and deliver all documents necessary to perfect the filing of a chapter 7 voluntary bankruptcy case on behalf of the corporation; and

Be It Further Resolved, that Kevin Tang, Chief Financial Officer of this limited liability company is authorized and directed to appear in all bankruptcy proceedings on behalf of the limited liability company, and to otherwise do and perform all acts and deeds and to execute and deliver all necessary documents on behalf of the limited liability company in connection with such bankruptcy case, and

Be It Further Resolved, that Kevin Tang, Chief Financial Officer of this limited liability company is authorized and directed to employ Kevin Tang, attorney and the law firm of Tang & Associates to represent the limited liability company in such bankruptcy case."

Date   __11/23/2019_____

Signed: /s/ Kevin Tang
    Kevin Tang

Resolution of Managing Member
of
**Consumer Financial Alliance LLC**

Whereas, it is in the best interest of this limited liability company to file a voluntary petition in the the United States Bankruptcy Court pursuant to Chapter 7 of Title 11 of the United States Code;

Be It Therefore Resolved, that **Kevin Tang, Chief Financial Officer** of this limited liability company, is authorized and directed to execute and deliver all documents necessary to perfect the filing of a chapter 7 voluntary bankruptcy case on behalf of the limited liability company; and

Be It Further Resolved, that **Kevin Tang, Chief Financial Officer** of this limited liability company is authorized and directed to appear in all bankruptcy proceedings on behalf of the limited liability company, and to otherwise do and perform all acts and deeds and to execute and deliver all necessary documents on behalf of the limited liability company in connection with such bankruptcy case, and

Be It Further Resolved, that **Kevin Tang, Chief Financial Officer** of this limited liability company is authorized and directed to employ **Kevin Tang**, attorney and the law firm of **Tang & Associates** to represent the corporation in such bankruptcy case.

Date  11/23/19                              Signed _____

Date  _____          Signed _____

| Information to identify the case: | | |
|---|---|---|
| Debtor | **Consumer Financial Alliance LLC**<br>_____<br>Name | EIN  **83-2557929** |
| United States Bankruptcy Court  **Central District of California** | | Date case filed for chapter  **7   11/23/19** |
| Case number:  **8:19-bk-14600-TA** | | |

## Official Form 309C (For Corporations or Partnerships)

## Notice of Chapter 7 Bankruptcy Case — No Proof of Claim Deadline      12/15

For the debtor listed above, a case has been filed under chapter 7 of the Bankruptcy Code. An order for relief has been entered.

This notice has important information about the case for creditors, debtors, and trustees, including information about the meeting of creditors and deadlines. Read both pages carefully.

The filing of the case imposed an automatic stay against most collection activities. This means that creditors generally may not take action to collect debts from the debtor or the debtor's property. For example, while the stay is in effect, creditors cannot sue, assert a deficiency, repossess property, or otherwise try to collect from the debtor. Creditors cannot demand repayment from debtors by mail, phone, or otherwise. Creditors who violate the stay can be required to pay actual and punitive damages and attorney's fees.

To protect your rights, consult an attorney. All documents filed in the case may be inspected at the bankruptcy clerk's office at the address listed below or through PACER (Public Access to Court Electronic Records at www.pacer.gov).

**The staff of the bankruptcy clerk's office cannot give legal advice.**

Do not file this notice with any proof of claim or other filing in the case.

| | | |
|---|---|---|
| 1.  **Debtor's full name** | Consumer Financial Alliance LLC | |
| 2.  **All other names used in the last 8 years** | fdba Vertias Financial Solutions LLC | |
| 3.  **Address** | 18377 Beach Blvd., Sute 213<br>Huntington Beach, CA 92648 | |
| 4.  **Debtor's attorney**<br>Name and address | Kevin Tang<br>Tang & Associates<br>18377 Beach Blvd<br>Suite 211<br>Huntington Beach, CA 92648 | Contact phone 714-594-7022<br>Email _____ |
| 5.  **Bankruptcy trustee**<br>Name and address | Thomas H Casey (TR)<br>22342 Avenida Empresa, Suite 245<br>Rancho Santa Margarita, CA 92688 | Contact phone (949) 766-8787<br>Email _____ |
| 6.  **Bankruptcy clerk's office**<br>Documents in this case may be filed at this address. You may inspect all records filed in this case at this office or online at www.pacer.gov. | 411 West Fourth Street, Suite 2030,<br>Santa Ana, CA 92701-4593 | Hours open:<br>9:00AM to 4:00 PM<br><br>Contact phone 855-460-9641<br><br>Dated: 11/25/19 |
| 7.  **Meeting of creditors**<br>The debtor's representative must attend the meeting to be questioned under oath by the trustee and by creditors. Creditors may attend, but are not required to do so. | **January 6, 2020 at 08:00 AM**<br><br>The meeting may be continued or adjourned to a later date. If so. the date will be on the court docket.<br><br>The trustee is designated to preside at the meeting of creditors. The case is covered by the chapter 7 blanket bond on file with the court. | Location:<br><br>**411 W Fourth St., Room 3-110, Santa Ana, CA 92701** |
| 8.  **Proof of claim**<br>Please do not file a proof of claim unless you receive a notice to do so. | No property appears to be available to pay creditors. Therefore, please do not file a proof of claim now.<br><br>If it later appears that assets are available to pay creditors, the clerk will send you another notice telling you that you may file a proof of claim and stating the deadline. | |

For more information, see page 2 >

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or proceeding.

My address is: 9572 Dumbreck Drive, Huntington Beach, CA 92646

A true and correct copy of the foregoing document entitled: **MOVANT CREDITOR THOMAS J. LYNCH'S AMENDED NOTICE OF MOTION AND MOTION TO DISMISS CHAPTER 7 BANKRUPTCY; and DECLARATION OF THOMAS J. LYNCH** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**3.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*), I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**2.  SERVED BY UNITED STATES MAIL**:
On, 1/14/20, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Tang & Associates – 18377 Beach Blvd., Suite 211, Huntington Beach, CA 92648
Thomas H. Casey (TR) – 22342 Avenida Empresa, Suite 245, Rancho Santa Margarita, CA 92688
U.S. Trustee (SA) – 411 W 4th St. #7160, Santa Ana, CA 92701
Clerks Office - U.S. Bankruptcy Court, Santa Ana Division, 411 W 4th St., Santa Ana, CA 92701
Hon. Theodor C. Albert - 411 West Fourth Street, Suite 5085, Santa Ana, CA 92701-4593

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*), I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 1-14-20 | Robert Jenkins | *(signature)* |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                    **F 9013-3.1.PROOF.SERVICE**